UNITED STATES of America, Appellee,

v.

Carlos M. PERDOMO,
Defendant–Appellant.

No. 238, Docket 90–1177.

United States Court of Appeals,
Second Circuit.

Argued Sept. 13, 1990.
Decided March 6, 1991.

John L. Pacht, Burlington, Vt., for defendant-appellant.

John P. Tavana, Asst. U.S. Atty., Burlington, Vt. (George J. Terwilliger, III, U.S. Atty., D. Vt., David V. Kirby, Asst. U.S. Atty., of counsel), for appellee.

Before PRATT, MAHONEY and WALKER, Circuit Judges.

WALKER, Circuit Judge:

Defendant Carlos Perdomo appeals from a final judgment of conviction entered in the United States District Court for the District of Vermont following his plea of guilty before Franklin S. Billings, Jr., *Chief Judge*, to one count of conspiracy to distribute cocaine, in violation of 21 U.S.C. §§ 841(a), (b) and 846. He was sentenced to a 168 month term of imprisonment, followed by three years of supervised release. On appeal Perdomo contends that the court erred in its application of the Sentencing Guidelines when it (1) considered conduct unrelated to the offense of conviction in selecting Perdomo's base offense level; (2) considered conduct outside of the offense of conviction in concluding that Perdomo was a manager or supervisor of a criminal activity involving five or more participants; and (3) concluded that Perdomo obstructed justice warranting an upward adjustment. We reject the first two contentions, but remand for reconsideration of the obstruction adjustment.

## BACKGROUND

On July 22, 1988 an unidentified man dropped off a package addressed to "Ricardo Cassvan" at the Miami–Dade International Airport's Continental Airlines counter for "Quik Pak" delivery to Burlington, Vermont. Continental personnel opened

the package and discovered 2.5 kilograms of white powder, 371 grams of which was pure cocaine. Drug enforcement agents substituted another substance for most of the cocaine and shipped the package to Burlington via the "Quik Pak" service.

Defendant Carlos Perdomo and a co-defendant, Miguel Fleitas, flew from Miami to Burlington that same day, accompanied by a woman who rented a car for them in Burlington and then returned to Miami. Perdomo went to the Continental package counter at the airport and, presenting a Canadian identification card in the name of Ricardo Cassvan, asked for a package. After he was told that the package would not arrive until 8:00 pm, he and Fleitas left. At 8:00 pm Perdomo returned, picked up the package and returned to the rental car driven by Fleitas. Agents from the Vermont Drug Task Force followed the car as it headed towards Burlington. Apparently aware of the surveillance, Perdomo and Fleitas took evasive measures, increasing and decreasing their speed, and turning into and out of two parking lots without stopping.

Perdomo and Fleitas eventually drove past and then turned into the Ho–Hum Motel in South Burlington, and went to the room they had checked into earlier. A few minutes later they returned to their rental car. While Perdomo opened the trunk, Fleitas took the package received at the airport from the glove compartment and placed it under a nearby car. When both men then got into the rental car and started to drive away, they were stopped and arrested by the Vermont Drug Task Force agents. Inside the rental car was a small quantity of marijuana, and the "Ricardo Cassvan" Canadian identification card, torn in half.

In a September 22, 1988 indictment describing only the events of July 22 outlined above, Perdomo and Fleitas were charged in five narcotics related counts, including one of conspiracy to distribute cocaine. On December 20, 1988 Perdomo pled guilty to the one count of conspiracy to distribute cocaine, in violation of 21 U.S.C. §§ 841(a), (b) and 846. During the plea allocution, the district court advised him of the maximum sentence that could be imposed under the statute and, although at that time the district court had found the Guidelines unconstitutional, that the Sentencing Guidelines might be applied to his case. After the Guidelines were held constitutional in *Mistretta v. United States*, 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989), the court ordered a presentence report.

The presentence report revealed that, prior to the events of July 22, 1988, Perdomo had been involved in a larger cocaine conspiracy to transport drugs from Miami to Montreal, Canada for distribution. According to the report, Perdomo had controlled a stash house for cocaine and cocaine proceeds in Miami. Between March 2 and March 14, 1988 federal agents recorded, pursuant to warrant, several phone conversations between Perdomo and a group of Cuban drug dealers in Montreal. In these conversations Perdomo initially agreed to deliver five kilograms of cocaine to the head of the Montreal group, Gumersindo Delgado, but ended up promising to deliver "with 100% certainty" only two kilograms. This deal was never consummated. However, on March 18, 1988 federal agents searched the stash house and found wrappers for twelve kilograms of cocaine, as well as cocaine residue in the drains.

The investigation also revealed that Perdomo had other contacts with the Montreal dealers. In February 1988 one of the dealers met Perdomo in Miami. In April 1988 Perdomo went to Montreal where he spent time in the Club Video Maniac, the business front for the Montreal drug operation. Perdomo then drove to Burlington, Vermont and took a plane back to Miami. On May 9, 1988 the Quebec police issued arrest warrants for members of the Montreal drug ring and Perdomo. On May 10 Delgado and the others in Montreal were arrested. In September 1988, after a trial in Canada, they were found guilty of drug trafficking and given sentences ranging from 2 to 7½ years of imprisonment.

On the basis of this information, the presentence report initially recommended that Perdomo be assigned an adjusted offense

level of 38, which, at a Criminal History Category I, carries a term of imprisonment of 235 to 293 months. This level was derived from a base offense level of 32, the result of adding the 371 grams of cocaine recovered on July 22 to the five kilograms of cocaine that Perdomo discussed selling to Delgado in March. The report then increased the base offense level by four points under § 3B1.1(b) upon a finding that Perdomo was an organizer or leader of criminal activity involving five or more persons, and by two points under § 3C1.1 for obstruction of justice. After Perdomo challenged the foregoing calculation the district court adjusted it by reducing the amount of cocaine negotiated in March from the five kilograms discussed to the two actually promised by Perdomo, thus lowering his base offense level from 32 to 28, and by classifying Perdomo as a manager or supervisor instead of a leader of a criminal activity involving five or more persons, resulting in a three point offense level increase instead of four. The district court declined to alter the obstruction of justice enhancement. The new adjusted offense level was 33, carrying a sentencing range of 135 to 168 months. On February 22, 1990, Judge Billings sentenced Perdomo to 168 months imprisonment. This appeal from his sentence followed.

## DISCUSSION

A. *Inclusion of the March Cocaine Negotiations as Part of the "Same Course of Conduct" as the Offense of Conviction*

■ Perdomo first argues that the two kilograms of cocaine he agreed to supply to Delgado in March 1988 should not have been included in calculating his base offense level. Perdomo accepts that Guideline § 1B1.3(a)(2) applies in narcotics cases such as this and that it requires the district court to include in the base offense level calculation conduct that is part of the

"same course of conduct or common scheme or plan." [1] However, he argues that the March negotiations cannot be characterized as part of the "same course of conduct or common scheme or plan" underlying the July shipment. He argues that the March and July incidents involved different players and that by July he could not have been in contact with the Montreal drug traffickers because they had been arrested in May and were in jail awaiting trial. He also asserts that his roles in the two transactions were different—in the March negotiations he acted as a supplier of a large quantity of cocaine to the head of the Montreal organization whereas in July he was a courier who personally picked up a much smaller quantity. These differences, he maintains, do not permit the district court's inclusion of the two kilograms negotiated in March in determining his base offense level under § 1B1.3(a)(2). We disagree.

Although we have repeatedly held that quantities and types of narcotics uncharged in the offense of conviction can be included in a defendant's base offense calculation if they were part of the "same course of conduct" or part of a "common scheme or plan" as that offense, *see United States v. Schaper*, 903 F.2d 891 (2d Cir.1990); *United States v. Colon*, 905 F.2d 580 (2d Cir. 1990), *see also* U.S.S.G. § 1B1.3(a)(2), comment. (backg'd), in *United States v. Santiago*, 906 F.2d 867 (2d Cir.1990), we drew an implicit distinction between these terms, defining "same course of conduct" apart from "common scheme or plan."

The defendant in *Santiago* sold heroin to one buyer a dozen times over a seven month period. The buyer was then arrested and spent eight months in jail. When he got out, defendant sold him heroin once again, for which he was arrested and convicted. In holding that the previous dozen sales, completed eight months earlier, con-

1. § 1B1.3(a)(2) reads:

(a) Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, ... shall be determined on the basis of the following:

(2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction;

stituted the "same course of conduct" as the offense of conviction, we adopted with approval the view of Judge Wilkins, the Chairman of the Sentencing Commission that:

> The phrase, however, at least encompasses that portion of [Federal Rule of Criminal Procedure] Rule 8(a) permitting joinder of offenses that "are of the same or similar character" or that involve "two or more acts or transactions connected together." The guideline term is broader than this analogous language, since it does not require a *connection* between the acts in the form of an overall criminal scheme. Rather, the guideline term contemplates that there be sufficient similarity and temporal proximity to reasonably suggest that repeated instances of criminal behavior constitute a pattern of criminal conduct.

906 F.2d at 872 (quoting Wilkins & Steer, *Relevant Conduct: The Cornerstone of the Federal Sentencing Guidelines* 41 S.C. L.Rev. 495, 515–16 (1990) (emphasis in original; footnote omitted). The "same course of conduct" concept thus looks to whether the defendant repeats the same type of criminal activity over time. It does not require that acts be "connected together" by common participants or by an overall scheme. It focuses instead on whether defendant has engaged in an identifiable "behavior pattern," *id.* at 872, of specified criminal activity.

Turning to the facts of this case as set forth in the presentence report, it was not clearly erroneous for the district court to view Perdomo's activities of July 22, 1988 as part of a pattern of behavior that originated in the winter and carried through to the summer. The investigation revealed that from February to May Perdomo was a "major participant" in a cocaine operation that transported Miami to Montreal, and that on at least one occasion he travelled through Burlington, Vermont after visiting Montreal on drug business. His receipt of a package of cocaine three months later in the Burlington airport leads to a reasonable inference that he was still engaged in supplying the Montreal market using Burlington as a transit point. Although by

July several major participants at the operation's Montreal end were incarcerated, the existence of additional buyers connected to those in jail was not foreclosed. It was not unreasonable for the district court to infer that Perdomo was continuing his Montreal activities, albeit under circumstances that had been somewhat altered due to the May 1990 arrests.

While the persons with whom Perdomo had directly dealt in the March negotiations to sell two kilograms and in the July 22 shipment of 371 grams were different and while his own role—from negotiator-supplier to deliverer-supplier—had also changed, these distinctions are not dispositive when determining whether these events constitute the "same course of conduct." Common identity of co-conspirators, which could be a key factor in identifying a common scheme or plan, as in identifying single or multiple conspiracies or criminal enterprises *see United States v. Cambindo Valencia*, 609 F.2d 603, 625–27 (2d Cir. 1979), *cert. denied*, 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980), may be unnecessary in determining whether a defendant himself has engaged in a pattern of criminal behavior—the focus of the "same course of conduct" inquiry. Likewise a change in the operation's *modus operandi*, seen here in Perdomo's role shift from May to July, need not affect the "same course of conduct" inquiry when defendant's continued involvement in the specified type of criminal activity—cocaine trafficking—remains evident. Here, where Perdomo acted as a supplier of cocaine from Miami to the Montreal area, supervising the operation by directing the activities of underlings in both March and July, it was not clearly erroneous for the district court to find his participation in the March negotiations part of the "same course of conduct" as the July transaction for § 1B1.3(a)(2) inclusion purposes.

B. *Rule 11, Due Process and Double Jeopardy Concerns*

    Perdomo next argues that the inclusion of the two kilograms he negotiated to sell in March in the calculation of his

sentence violates Rule 11 of the Federal Rules of Criminal Procedure, which requires that when pleading guilty the defendant be informed of the nature of the charge against him and the consequences of his plea. This argument fails, however, because Rule 11 was satisfied when Judge Billings informed Perdomo of the maximum sentence he could receive under the statute and told him that the guidelines, if found to be constitutional, would apply to his case. Rule 11 does not require the court and the prosecutor to calculate how the guidelines will actually apply to a defendant's case at the time of sentencing. *See United States v. Fernandez,* 877 F.2d 1138, 1142–43 (2d Cir.1989).

The principal question raised by Perdomo under the rubric of "due process" is whether by divulging information about other crimes during the presentence investigation he is incriminating himself in those crimes, thereby exposing himself to future prosecution. To the extent that such an argument converges with a possible double jeopardy claim if the defendant should later be prosecuted for the other acts which were included in his sentence, we believe it has considerable force, because double jeopardy includes the right not to be punished twice for the same offense. *Whalen v. United States,* 445 U.S. 684, 688, 100 S.Ct. 1432, 1435, 63 L.Ed.2d 715 (1980). Resolution of this issue, however, must properly await the second prosecution, if any. To date a second indictment has not been returned against Perdomo for the March 1988 conspiracy to distribute the two kilograms of cocaine included by Judge Billings in calculating his sentence on this indictment.

## C. *Role in the Offense Calculation*

■ Perdomo next argues that the court improperly increased his offense level by three points under § 3B1.1(b), which authorizes this increase for a defendant's "role in the offense" as "a manager or supervisor (but not an organizer or leader) ... [of] criminal activity [that] involved five or more participants or was otherwise extensive." Perdomo contends that a § 3B1.1 upward adjustment cannot be based on con-

duct beyond the offense of conviction because that section speaks of the defendant's role in the "offense," not in uncharged conduct. Therefore, he argues, only his role in the events of July 22 can be considered under this section, and as that conspiracy involved at most four people—Perdomo, Fleitas, the woman who accompanied them to Burlington, and possibly the person who dropped the cocaine off at the Miami airport—the three point enhancement is inapplicable. Moreover, he argues, the government is foreclosed from claiming that the activity was "otherwise extensive," because Judge Billings made no specific finding to that effect as required by *United States v. Lanese,* 890 F.2d 1284 (2d Cir.1989), *cert. denied* —— U.S. ——, 110 S.Ct. 2207, 109 L.Ed.2d 533 (1990). We disagree with Perdomo's first point, however, and thus do not conclude that Judge Billings erred in applying § 3B1.1 to uncharged conduct relevant to the charged offense.

Although the introductory commentary to Chapter 3, Part B of the Sentencing Guidelines in effect at the February 1990 sentencing did not elaborate on what constituted the "offense" for role in the offense adjustments, the same commentary was amended, effective November 1, 1990, to read:

> The determination of a defendant's role in the offense is to be made on the basis of all conduct within the scope of § 1B1.3 (Relevant Conduct), *i.e.* all conduct included under § 1B1.3(a)(1)–(4), and not solely on the basis of elements and acts cited in the count of conviction.

The effect of this commentary change is to foreclose after November 1, 1990, any interpretation of the word "offense" that restricts it to the offense of conviction—the interpretation Perdomo now urges upon this court. Before this amendment some courts had limited the role in offense adjustment to the facts of the offense of conviction. *See United States v. Tetzlaff,* 896 F.2d 1071, 1074 (7th Cir.1990); *United States v. Zweber,* 913 F.2d 705, 709 (9th Cir.1990); *United States v. Williams,* 891

F.2d 921, 925 (D.C.Cir.1989). However, this circuit had not addressed the issue.

The Commission's subsequent commentary sheds light on the pre-November 1, 1990 sentencing at issue here. The Commission views the new language as simply "clari[fying] the conduct which is relevant to the determination of Chapter Three, Part B," United States Sentencing Commission *Guidelines Manual,* Appendix C, amendment 345 (Nov. 1990), not as substantively changing the earlier guideline. Although we need not accept as conclusive the Commission's instructions on how we should interpret their earlier commentary, we do believe that "the Commission's view of its purpose in revising its guidelines and commentary is entitled to considerable deference." *United States v. Guerrero,* 863 F.2d 245, 250 (2d Cir.1988).

Moreover, the idea that role in the offense includes the defendant's role in § 1B1.3 relevant conduct, including conduct that is part of the "same course of conduct" as that charged, is supported by other provisions in the Guidelines and the Commentary that were in effect at the time of the offense and at sentencing. Guideline § 1B1.3(a) directs that Chapter 3 adjustments, which include those for role in the offense, shall be determined according to factors additional to the offense of conviction, including, in "quantity grouping" cases such as drug cases, "all acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction" U.S.S.G. § 1B1.3(a) and (a)(2). Thus prior to the November 1990 amendments the Guidelines did link the determination of role in the offense to relevant conduct outside the offense of conviction.

In light of the Guidelines as a whole, therefore, we agree with the Commission that the November 1990 amendment merely clarifies a preexisting Guidelines understanding of "role in the offense"—albeit one not reflected in prior case law—as including consideration of the defendant's role in uncharged conduct deemed "relevant" under § 1B1.3. Because we have determined that the defendant's considerable narcotics activity from February to May 1988 is part of "the same course of conduct" and thus is includable in the base offense level calculation, we find that it also is includable for role in the offense purposes. From February to May 1988, according to the presentence report, Perdomo was a "manager or supervisor of a criminal activity involving five or more members," and the names of five or more of those principals are specifically set forth.[2] Accordingly, Judge Billings' adoption of that conclusion was not clearly erroneous and we uphold Perdomo's three point enhancement under this section.

### D. *Obstruction of Justice Enhancement*

■ Perdomo argues finally that two levels should not have been added to his sentence under § 3C1.1 for "Obstructing or Impeding the Administration of Justice" because the findings of the presentence report on that score relied in part on conduct beyond the charged offense,[3] and to

---

**2.** Those arrested and later convicted in Montreal by Canadian officials for their role in the Miami to Montreal drug operation were Carlos Delgado, Ciro Ibanez, Gustavo Alonso, and someone referred to in the report only as Fernandez. Together with Perdomo, for whom a warrant was issued, this part of the operation thus had five named participants.

**3.** The presentence report listed five instances of obstruction of justice:

(1) Perdomo's March 19, 1988, attempt to dispose of a quantity of cocaine before investigating agents arrived at a "stash" house in Miami.

(2) Perdomo's instructions to Miguel Fleitas on July 22, 1988 *to conceal the cocaine package under a nearby car.*

(3) Perdomo's statement to the investigating probation officer that he had only called Gumersindo Delgado "a few times" to enlist Delgado's assistance in trying to get Perdomo's wife to Canada, or to the United States, via Canada. In fact, there were more than "a few" telephone conversations with Delgado and none of them involved Perdomo's wife's immigration. All of the telephone conversations between Perdomo and Delgado were related to narcotics trafficking.

(4) Perdomo's statement to the probation officer that Ricardo Cassvan was on the plane from Miami to Burlington on July 22, and that Perdomo was acting for him, when there is *no evidence that Cassvan was on the plane.*

the extent it did not, because such conduct was not proven by a preponderance of the evidence. Because we agree with Perdomo that conduct outside the charged offense should not have been considered under this section, and because we are troubled by Judge Billings' findings regarding Perdomo's "obstructive" conduct within the offense, we vacate the two point enhancement and remand the matter to the district court for reconsideration.

Section 3C1.1 states:

If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels.

In considering the definition of "offense" for the purposes of a Chapter 3 adjustment to the base offense, we must turn, as we did earlier, to § 1B1.3. That section states that "unless otherwise specified," adjustments in Chapter 3 shall be determined on the basis of relevant conduct outside of the offense of conviction. But here, unlike in § 3B1.1, the interpretation of the word "offense" is "otherwise specified." In § 3C1.1 "offense" is modified by "instant." Any interpretation other than that § 3C1.1 refers to efforts to obstruct the prosecution of the conviction offense only would render this modifier meaningless.

■ Our review of whether the facts set out in the presentence report constitute obstruction of justice under the Guidelines is a matter of legal interpretation, and is subject to our *de novo* review. *United States v. Shoulberg*, 895 F.2d 882, 884 (2d Cir.1990). Confining our inquiry to the defendant's statements and actions pertaining to the events of July 22, 1988, and viewing them in the light most favorable to the defendant, Guideline Commentary § 3C1.1, Application Note 2 (November 1, 1989), *United States v. Thomas–Hamilton*, 907 F.2d 282, 285 (2d Cir.1990), we are unable to conclude that they necessarily lead to a finding of obstruction. It is as

possible that Perdomo directed Fleitas to place the cocaine under a car because that was its drop-off point as it is that he was attempting to thereby conceal the cocaine from law enforcement officers. Further, Perdomo's statement that Cassvan was on the plane was not shown by a preponderance of the evidence to be false; the presentence report states only that there was no evidence that Cassvan was on the plane. This implies that the investigator put the burden on Perdomo to prove that Cassvan was present, instead of proving the falsity of Perdomo's statement by putting forth evidence to indicate that he was *not*. Finally, Perdomo's statement that he intended to drive to New York from Burlington is not necessarily belied by the fact that he was only carrying $50 in cash. If the cocaine deal had gone through he would have had a good deal more than that to finance his trip. Thus each of these examples of "obstruction" is susceptible to an innocent reading, yet in adopting the presentence report's interpretations wholesale Judge Billings did not appear to attempt to discover the truth or falsity of Perdomo's statements, or in the case of the cocaine placement, to determine whether he in fact intended to obstruct justice thereby. Such a finding of a specific intent to obstruct justice is a prerequisite to the two level enhancement. *United States v. Stroud*, 893 F.2d 504, 507–08 (2d Cir.1990); *United States v. Thomas–Hamilton*, 907 F.2d at 285. We therefore remand the case to Judge Billings to reevaluate the presentence report's conclusions that Perdomo's statements were material falsehoods amounting to an obstruction of justice and to make factual findings regarding Perdomo's intent in directing Fleitas to hide the package.

Accordingly, we affirm the sentence in all respects other than the two point enhancement for obstruction, and remand for further proceedings not inconsistent with this opinion.

(5) Perdomo's statement to the probation office that on July 22 he and Fleitas were planning to take a leisurely drive to New York by car and from there to return to Miami by plane. Yet when he was arrested, Perdomo had less than $50 in cash and no credit cards.

Affirmed in part; sentence vacated and remanded for resentencing.