**UNITED STATES of America,**

v.

**Flora MARQUEZ, Defendant.**

**No. S7 91 Cr. 0451 (SWK).**

United States District Court, S.D. New York.

July 16, 1993.

Mary Jo White, U.S. Atty., S.D.N.Y. by Amy E. Millard and Chauncey G. Parker, Asst. U.S. Attys., New York City, for U.S.

Robert S. Wolf, New York City, for Marquez.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

Following a *Fatico* hearing held on June 24, 25 and 28, 1993, the Court makes the following findings relevant to the sentencing of the defendant, Flora Marquez: (1) 32 is the appropriate Base Offense Level; (2) Marquez was neither a minor nor minimal

participant in the conspiracy, and thus, is not entitled to a downward adjustment in her offense level; (3) Marquez is not entitled to a downward departure, pursuant to § 5K2.13 of the Sentencing Guidelines, on the grounds of diminished capacity; and (4) Marquez is not entitled to a three point reduction for acceptance of responsibility pursuant to § 3E1.1(b) of the Sentencing Guidelines. Based on the foregoing, the Total Offense Level is 30, the Criminal History Category is I, and the applicable guidelines range is 97–121 months.

## I.  Background

On May 20, 1993, Marquez plead guilty, pursuant to a Plea Agreement dated May 18, 1992, and signed on May 20, 1992, to Count One of a superseding information (S7 91 Cr. 451) charging her with conspiracy to distribute and possess with intent to distribute more than one hundred grams of heroin, in violation of 21 U.S.C. § 846. According to the Plea Agreement, this charge carries a maximum sentence of forty years imprisonment, a mandatory minimum sentence of five years imprisonment, a maximum fine of $2,000,000, a maximum supervised release term of life and a mandatory minimum supervised release term of four years following any term of imprisonment, and a $50 special assessment. Plea Agreement at 1.

At the time of the plea, however, it was anticipated that there would be a *Fatico* hearing prior to sentencing to resolve disputes regarding the amount of narcotics involved in the conspiracy and any "related conduct" by Marquez. Specifically, the Plea Agreement stated that:

Flora Marquez disputes the Government's view of the amount of heroin involved in the charged conspiracy and the Government's view of the defendant's "related conduct." At a *Fatico* hearing, the Government will seek to prove that Flora Marquez conspired to distribute or possess with intent to distribute not more than 500 grams of heroin [a 32 base offense level], and that Flora Marquez's cocaine dealing with [co-conspirator Francisco Cruz]— which, in the Government's view is related

conduct under the Guidelines—did not exceed eight kilograms.

Plea Agreement at 2.

In addition, during her allocution, Marquez acknowledged only that (1) she received a sample of heroin from Francisco Cruz ("Cruz"); (2) she took the sample from Cruz because she wanted to help him sell it; (3) she talked with Cruz about the delivery of a sample of heroin to her apartment; (4) the sample of heroin was no good; (5) she threw out the heroin sample; (6) she told Cruz that the police were following one of his employees. *See* Transcript of Marquez Plea ("Plea Tr.") at 18–20.

Further, it was made clear on the record that both parties agreed that: (1) Marquez would simply plead to being part of the conspiracy; (2) Marquez disputed the government's contention as to the amount of narcotics involved; (3) the amount involved would be resolved at a *Fatico* hearing; and (4) by operation of law if the Government failed to prove the statutory requirement of a hundred grams or more of heroin at the *Fatico* hearing, Marquez would be subject to a lesser offense which contains no statutory minimum incarceration period. *See* Plea Tr. at 7–9.

Subsequent to the plea, the Court received numerous submissions from the Government and Marquez in anticipation of the *Fatico* hearing. From those submissions it became clear that the issues to be resolved at the *Fatico* hearing were as follows: (1) the appropriate Base Offense Level; (2) Marquez's role in the offense; and (3) whether Marquez had "diminished capacity" at the time of the offense. Although not necessitating a hearing, there was also the issue of whether Marquez was entitled to a three point reduction, pursuant to the amendment to § 3E1.1(b) of the Sentencing Guidelines, for acceptance of responsibility.

## II.  The *Fatico* Hearing

The *Fatico* hearing was held by the Court on June 24, 25 and 28, 1993. The Government presented one witness in its case in chief, namely, Cruz, a co-conspirator of Marquez. In general, he testified about Marquez's involvement with both heroin and co-

caine dealing. He also explained the significance of approximately 55 wiretapped conversations involving himself, Marquez and his "workers." The defense case consisted of the testimony of (1) Marquez, who generally explained her involvement in the conspiracy, as well as her understanding of the wiretapped conversations; and (2) Dr. Richard Goldstein, who testified as to Marquez's mental state at the time of the offense. In rebuttal, the Government called Dr. Robert Berger to testify about his findings regarding Marquez's mental state.

In addition, two stipulations were read into the record and admitted in evidence. One pertained to the authenticity and accuracy of the wiretapped conversations and transcripts of the conversations. *See* Government Exhibit 101. The other pertained to a search of Marquez's apartment located at 175 West 81st Street. Specifically, the parties stipulated that during the course of the search, $69,000 in United States currency was recovered from the hallway of Marquez's apartment. *See* Government Exhibit 102.

Finally, the following was admitted in evidence at the hearing: (1) the reports of Dr. Robert Goldstein, Dr. Robert Berger and Dr. Sanford Drob; (2) tapes of the wiretapped conversation; (3) transcripts of the wiretapped conversations; (4) the $69,000 recovered from Marquez's apartment; (5) the plastic bags used to hold the money.

Before addressing the specific issues requiring resolution, the Court makes these general findings with respect to the *Fatico* hearing: (1) Cruz's testimony was highly credible, especially as corroborated by the wiretapped conversations; (2) Cruz's testimony and the wiretapped conversations paint a clear picture of Marquez's extensive involvement in the conspiracy; (3) Marquez's testimony was wholly incredible and inconsistent with the wiretapped conversations; (4) Marquez's assertions that (a) she did not say particular code words on the wiretapped conversations; (b) certain portions of the wiretapped conversations attributed to her in the transcript were not her voice; and (c) certain wiretapped conversations were edited, fixed, or doctored, were incredible.

## III. Disputed Issues

### A. *Base Offense Level* [1]

#### 1. Probation's Determination

The Presentence report recommended a Base Offense Level of 32. According to the Probation Department:

Marquez's involvement in this conspiracy dates back to at least early 1990 until her arrest in May 1991. According to individuals involved in narcotics transactions with the defendant, from the period of about March or April 1990, to February 1991, they conspired to distribute more than 700 grams of heroin and approximately 5 to 7 kilograms of cocaine during that time. Marquez's heroin and cocaine dealing is corroborated by extensive evidence contained in the wiretapped phone calls which show her regularly dealing in amounts of heroin ranging from gram size samples to packages of more than 125 grams as well as with kilos of cocaine. For example, on September 5, 1990, Francisco Cruz had a conversation with the defendant in which he states that he has "one that holds two ... at $27,000 pesos." 125 grams of heroin at that time cost approximately $27,000. One that holds two refers to the strength of the heroin. Marquez's narcotics activity is further corroborated by surveillance by law enforcement officials who observed Cruz and one of his co-workers at her apartment. Moreover, the seizure of $69,440 in small bills stuffed in plastic shopping bags is further corroboration of extensive narcotics dealings. With regard to the actual computation, per the pre-November 1, 1991 guidelines, the cocaine will be converted into heroin for the purpose of establishing a single offense level. If we were to apply the conservative estimate of five kilograms of cocaine, its heroin equivalent is 1000 grams or one kilogram as one gram of cocaine is equivalent

---

1. Before turning to the specific disputed issues, the Court notes that "disputed sentencing factors need only be proved by a preponderance of the evidence." *United States v. Rivera*, 971 F.2d 876, 891 (2d Cir.1992) (quoting *United States v. Rodriguez–Gonzalez*, 899 F.2d 177, 182 (2d Cir.), *cert. denied*, 498 U.S. 844, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990)).

to .2 grams of heroin. If the higher quantity of seven kilograms of cocaine is applied, then the heroin equivalent is 1400 grams or 1.4 kilograms. One thousand grams of heroin, coupled with 700 grams, equals 1700 grams of heroin or 1.7 kilograms. Fourteen hundred grams, added to seven hundred grams amounts to twenty one hundred grams or 2.1 kilograms of heroin. Thus, the higher quantity, which does not affect the base offense level, will be considered for according to page 2.43 in the Guidelines (Drug Quantity Table), at least one kilogram of heroin, but less than three kilograms of heroin, establishes a base offense level of thirty two.

Presentence Report at ¶ 137. This offense level is disputed by Marquez.

### 2. Applicable Law

■ Sentencing Guideline § 1B1.3(a)(2) provides that in determining the appropriate base offense level for offenses as to which Guidelines § 3D1.2(d) would require grouping—such as drug offenses—a court should consider all relevant conduct; that is, a court should consider "all acts and omissions ... that were part of the same course of conduct or common scheme or plan as the offense of conviction." In addition, in determining the base offense level, a court should consider all "acts and omissions committed, aided, abetted, [or] counseled ... by the defendant." Guidelines § 1B1.3(a)(1)(A); *United States v. Beaulieau*, 959 F.2d 375, 379 (2d Cir.1992). Thus, the base offense level for drug offenses "is to be calculated after taking into account the entire quantity involved in the defendant's demonstrated narcotics activity rather than a smaller amount for which the defendant has been charged and convicted." *United States v. Rivera*, 971 F.2d at 892 (quoting *United States v. Schaper*, 903 F.2d 891, 898 (2d Cir.1990)).

The Courts have repeatedly held that differences in participants, types of narcotics, and time lapses in transactions from the offense of conviction are not determinative of whether conduct is relevant. A court may include in its calculations as relevant conduct " 'quantities of narcotics that were neither seized nor charged' in the indictment," *United States v. Cousineau*, 929 F.2d 64, 67 (2d Cir.1991) (quoting *United States v. Santiago*, 906 F.2d 867, 871 (2d Cir.1990)); acts separated by time, *United States v. Cousineau*, 929 F.2d at 68 (relevant uncharged conduct pre-dated conduct charged in conspiracy by two years); narcotics transactions in which the defendant's role was different in each transaction and the parties to the transactions were different, *United States v. Perdomo*, 927 F.2d 111, 114–115 (2d Cir.1991) (conduct is relevant although defendant is a supplier of a large quantity of cocaine in one transaction and a courier of a smaller quantity in another); *United States v. Beaulieau*, 959 F.2d at 378–79 (drug sales to different parties); and different types of narcotics, *United States v. Burnett*, 968 F.2d 278, 280–81 (2d Cir.1992) (defendant plead guilty to possession with intent to distribute marijuana; sale of four kilograms of cocaine to person other than one from whom he purchased marijuana determined to be relevant conduct); Guidelines § 1B1.3 Commentary (Background) ("quantities and types of drugs not specified in the count of conviction are to be included in determining the offense level if they were part of the same course of conduct or common scheme or plan as the count of conviction").

■ Quantities of unseized narcotics that were part of the "same course of conduct" or "common scheme or plan" as the offense of conviction shall be approximated by the sentencing judge for purposes of offense level calculations. *United States v. Schaper*, 903 F.2d 891, 898 (2d Cir.1990); *United States v. Colon*, 905 F.2d 580, 587 (2d Cir.1990). In making these estimates, a court may rely on testimony as to conversations between the defendant and one with whom she engaged in narcotics deals. *See United States v. Perrone*, 936 F.2d 1403, 1419 (2d Cir.1991); *United States v. Vargas*, 920 F.2d 167, 169 (2d Cir.1990) (sole witness at *Fatico* hearing was cooperating co-defendant; court explicitly credited relevant portions of co-defendant's testimony, and evidence at hearing included transcript of relevant tape recording and third defendant's trial), *cert. denied,* —— U.S. ——, 112 S.Ct. 93, 116 L.Ed.2d 64 (1991); *see also United States v. Villarreal*, 977 F.2d 1077 (7th Cir.1992) (in determining

drug quantity, court properly relied on accomplice testimony, cash found on defendant, phone records, drug records, and drugs seized), *cert. denied,* —— U.S. ——, 113 S.Ct. 1350, 122 L.Ed.2d 731 (1993).

### 3. Discussion

■ Based on the three day hearing, the Court agrees with the Presentence Report's recommendation of a 32 Base Offense Level. Cruz's testimony, as well as the wiretapped conversations, indicate that Marquez engaged in narcotics dealing with Cruz from the summer or fall of 1989 until February of 1991. They also indicate that Marquez bought heroin from Cruz to sell to her various customers. In addition, Marquez dealt in cocaine, had her own cocaine source and sold cocaine to Cruz and customers that Cruz brought her.

Specifically, as to conduct prior to the charged conspiracy, Cruz credibly testified that he met Marquez in or about September 1989 and that she was his first heroin customer. Transcript of *Fatico* hearing ("Tr.") at 11–14. At their first meeting, Cruz delivered a one gram sample of heroin to Marquez in exchange for $100. Tr. at 13–14. The next day, Marquez called Cruz requesting that he get her 28 grams of heroin. Tr. at 14. The two met at a restaurant at Academy and Broadway where Cruz gave her the 28 grams in exchange for approximately $5800. Tr. at 15.

Cruz went on to testify that about five or six days later, Marquez called him again and told him that "she wanted to go to 125th." Cruz credibly explained that Marquez was referring to 125 grams of heroin. Tr. at 16. Cruz obtained the 125 grams of heroin and gave them to Marquez at her apartment on 81st Street and Amsterdam Avenue. Marquez gave Cruz $26,000 in return. Tr. at 17–18.

Cruz also credibly testified that in September or October of 1989, he brought Marquez and a friend of hers a heroin sample in exchange for $100. Tr. at 21. Subsequent to that delivery, Marquez called Cruz and told him she needed 250 grams. Tr. at 22. Cruz got the 250 grams from his source and gave it to Marquez at her apartment. Tr. at 22–23. About one and one half hours later, Flora and her friend brought Cruz $352,000 for the heroin. Tr. at 24.

With respect to his overall relationship with Marquez, Cruz testified that he continued to sell heroin to Marquez until February of 1991. During that time, Cruz would see Marquez "once, twice, three times a week...." Tr. at 25–26. When asked what kind of weight of heroin he sold to Marquez during this time, Cruz responded "14, 7, 3, 28, 125 [grams], whatever she asked me for." Tr. at 26. Either Cruz or one of his workers would deliver these packages of heroin to Marquez at her apartment. Tr. at 26.

Aside from heroin, Cruz also credibly testified that in the early days of their relationship, Marquez sold him three kilograms of cocaine for $19,000 each. Specifically, Cruz testified that about two weeks after he met Marquez, he asked her to get him two kilograms of cocaine. Tr. at 18. Marquez got the cocaine and sold it to Cruz for $19,000 a kilogram. Tr. at 18. Shortly thereafter, Marquez gave Cruz another kilogram to sell in exchange for $19,000. Tr. at 19. Subsequent to these transactions, Cruz took a friend who wanted to buy cocaine to meet Marquez. Tr. at 19. The two went to Marquez's apartment, where Cruz introduced his friend to Marquez and told her that they had $70,000 for ten kilograms of cocaine. Tr. at 20. Marquez, however, was only able to provide them with 6 kilograms of cocaine. Tr. at 21.

In addition to Cruz's testimony, the Government relied upon wiretapped conversations to prove that Marquez's drug dealing properly resulted in a 32 Base Offense Level. These conversations took place from August 1990 to February 1991, during the time of the charged conspiracy, and were primarily between Cruz and Marquez, and Marquez and Cruz's workers. As credibly explained and interpreted by Cruz, *see* Tr. at 38–77, the wiretapped conversations indicate that Marquez was fully involved in the drug trade, and that she had full knowledge of the drug

activity going on.[2]

Specifically, the tapes and transcripts established the following: (1) using a variety of code words, such as "photo," "rolls," "decks of cards," "women," "pearl," "fabric," "car," "kids," Marquez asked Cruz on numerous occasions to bring samples of heroin to her apartment so that she could give them to her customers, *see* Government Exhibits 001, 002, 005, 007, 009, 010, 020, 025, 029, 034, 052, 054 (transcripts of wiretapped conversations); (2) using the same code words, Marquez frequently discussed (a) heroin to be provided by Cruz; (b) heroin already provided by Cruz; and (c) the quality of such heroin, *see* Government Exhibits 003, 004, 007, 009, 010, 016, 017, 019, 021, 022, 024, 025, 029, 030, 032, 033, 034, 035, 036, 037, 043, 044, 045, 046, 047, 051, 052, 054, 055; (3) Marquez often discussed specific amounts of heroin that she received from Cruz and was to sell to her own customers, *see* Government Exhibits 007 (4 grams), 021 (125 grams), 024 (125 grams), 035 (10 grams), 037 (14 grams), 043 (14 and 28 grams), 055 (3½ grams); *see also* Tr. at 183 (Marquez testimony); (4) Marquez often spoke with and about the workers in Cruz's heroin organization, *see* Government Exhibits 001, 007, 008, 013, 015, 020, 024, 036, 046, 047, 048; (5) Marquez discussed money owed to her as a result of her heroin dealing, *see* Government Exhibits 029, 037; (6) on more than one occasion, Marquez warned Cruz and his workers of the dangers of the drug trade and told them that they were being followed after they dropped heroin off at her apartment, *see* Government Exhibits 012, 013, 014, 048, 049, 050; (7) Marquez was also involved with dealing cocaine; there was discussion between Marquez and Cruz about (a) samples of cocaine (referred to as "champagne"); (b) cocaine that Cruz had obtained; (c) the cost of cocaine; and (d) a kilogram of cocaine that Marquez sold to someone other than Cruz, *see* Government Exhibits 022, 031, 042.[3]

Based on the foregoing, as well as the stipulation entered into between the parties that establishes that $69,000 was recovered from Marquez's apartment, the Court finds that Marquez was deeply involved in both heroin and cocaine dealing. Further she was fully aware of the amount of drugs being dealt and the scope of the larger conspiracy. As to the specific amounts involved, the Court finds that Marquez distributed or conspired to distribute a total of 629.50 grams of heroin (405 during the time period prior to the charged conspiracy and 224.50 during the period of time covered by the charged conspiracy) and a total of 10 kilograms of cocaine (9 kilograms during the time prior to the charged conspiracy and 1 kilogram during the time of the charged conspiracy).[4]

With regard to the actual computation, the cocaine is converted into heroin for purposes of establishing a single offense level. The heroin equivalent of 10 kilograms of cocaine is 2000 grams. *See* Presentence Report at ¶ 137. 2000 grams of heroin, added to 629.50 grams of heroin yields a total of 2629.50 grams of heroin. As a Base Offense Level of 32 encompasses at least one kilogram of heroin, but less than three kilograms of heroin,

---

**2.** Although the wiretapped conversations do not specifically corroborate Cruz's testimony regarding earlier transactions, they confirmed for the Court that Marquez and Cruz had a longstanding relationship involving both heroin and cocaine dealing.

**3.** Implicit in these findings is the Court's rejection of Marquez's testimony. Marquez's testimony that (1) she never engaged in drug related activity with Cruz prior to the charged conspiracy, *see* Tr. at 133–36, 138–40; (2) for the most part the wiretapped conversations were not drug related, *see* Tr. at 144–146, 149, 153–54, 169, 171, 174, 176, 177–78, 184, 191; (3) she did not use certain code words for drugs, *see* Tr. at 146–49, 153–55, 156, 161, 163, 169, 176, 177–78, 180, 184, 188, 190, 192; (4) she made up drug related conversations because she was afraid Cruz would kidnap her and steal her money, *see* Tr. at 137–38, 149, 152–53, 155, 157–58, 159, 181; and (5) she did not remember certain portions of the conversations that Cruz testified were drug related, *see* Tr. at 170–71, 176, 184, 185, 186–88, 190, was completely incredible and not credited by the Court.

**4.** Marquez's Post–*Fatico* Hearing Memorandum ("Def.Mem.") dwells on caselaw that requires that there be a finding that the amount of narcotics for which a defendant is held accountable was known or reasonably foreseeable by the defendant. Def.Mem at 2–3. In this case, there is no problem in that regard as Marquez was not held accountable for any narcotics that were not directly related to her part in the overall conspiracy.

*see* Guidelines § 2D1.1(c) (Drug Quantity Table), the total amount falls well within a Base Offense Level of 32. However, because the Plea Agreement specifically anticipated distribution of no more than 500 grams of heroin and 8 kilograms of cocaine, the Court finds, for sentencing purposes, that Marquez distributed 500 grams of heroin and 8 kilograms of cocaine, resulting in a 32 base offense level.[5]

## B. *Role in the Offense*

### 1. Probation's Determination

In the initial Presentence Report, there were no adjustments made for Marquez's role in the offense. *See* Presentence Report at ¶ 139. After receiving Marquez's objections to that determination, the Probation Department explained the rationale for its position. According to the Probation Department,

> The defendant was not simply a customer of Francisco Cruz, one of the "links" in [a complex] chain. Wiretapped telephone conversations show that from about August 1990 to about February 1991, the defendant negotiated with Cruz for heroin, arranged for delivery of numerous samples of heroin, discussed completed deals, and complained about the quality of some of Cruz's deliveries. The defendant regularly purchased amounts of heroin from Cruz for resale to her own customers. In addition, the telephone calls also show the defendant and Cruz conducting cocaine transactions, as well as heroin transactions. This conduct is hardly indicative of minor or minimal participation.... Even when taken solely in the context of her involvement with Cruz, the defendant's conduct does not warrant a downward departure.

Addendum to the Presentence Report at ¶ 2. This determination is disputed by Marquez, who seeks a two to four point reduction, pursuant to § 3B1.2 of the Sentencing Guidelines, for her minimal or minor role in the offense.

### 2. Applicable Law

Guidelines § 3B1.2 provides that based on the defendant's role in the offense, the offense level should be decreased as follows:

(a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.

(b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels.

In cases falling between (a) and (b), decrease by 3 levels.

This section provides a court with a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant. *See* Background Note. The Application Notes provide more specific guidance as to which situations warrant these adjustments:

1. Subsection (a) applies to a defendant who plays a minimal role in concerted activity. It is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group. Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant.

2. It is intended that the downward adjustment for a minimal participant will be used infrequently. It would be appropriate, for example, for someone who played no other role in a very large drug smuggling operation than to offload part of a single marihuana shipment, or in a case where an individual was recruited as a courier for a single smuggling transaction involving a small amount of drugs.

3. For purposes of § 3B1.2(b), a minor participant means any participant who is less culpable than most other participants, but whose role could not be described as minimal.

In addition, the Second Circuit has held that a defendant is not entitled to an adjustment pursuant to this section simply because he was less culpable than the other defen-

---

**5.** The defense is assured that amounts above 500 grams of heroin and 8 kilograms of cocaine will

not be considered in determining the precise sentence within the applicable guidelines range.

dants. *United States v. Lopez*, 937 F.2d 716, 728 (2d Cir.1991). According to the Second Circuit, "the intent of the Guidelines is not to 'reward' a guilty defendant with an adjustment merely because his co-conspirators were even more culpable." *Id.* As such, a defendant's role in the offense is determined "not only by comparing the acts of each participant in relation to the relevant conduct for which the participant is held accountable, ... but also by measuring each participant's individual acts and relative culpability against the elements of the offense of conviction...." *Id.* (citing *United States v. Daughtrey*, 874 F.2d 213, 216 (4th Cir.1989)).

▪ In other words, whether a defendant may be accorded the benefit of a minor or minimal role adjustment under § 3B1.2 does not turn solely upon his status or assigned task in the criminal enterprise, *United States v. Garcia*, 920 F.2d 153, 155 (2d Cir.1990), but rather on the defendant's culpability in the context of the facts of the case. *Id.; see e.g., United States v. Olvera*, 954 F.2d 788, 793 (2d Cir.1992) (although defendant's participation was less than that of co-defendants, defendant weighed narcotics, secreted them in apartment, and was present during one sale and one negotiation; defendant not entitled to "minor" status); *United States v. Garcia*, 920 F.2d at 155 (mere courier who was close to source of cocaine and delivered a single package to an undercover officer does not warrant "minor" status); *United States v. Colon*, 884 F.2d 1550 (2d Cir.1989) (a defendant who merely "steers" business to a seller in a street drug sale, and has knowledge of the seller's scheme, does not warrant an adjustment).

▪ Finally, in requesting such an adjustment, the defendant bears the burden of proving by a preponderance of the evidence, that his role in the offense is minor or minimal. *United States v. Lopez*, 937 F.2d at 726.

### 3. Discussion

▪ Based primarily on the testimony and conversations discussed above, the Court finds that the Presentence Report correctly determined that Marquez is not entitled to any adjustment for her role in the offense.

Marquez was not simply a customer of Cruz—and certainly not a one time customer—but rather was fully involved in repeated drug transactions with Cruz. Specifically, she negotiated narcotics deals with Cruz, acted as Cruz's connection by finding him customers, received at her home deliveries of samples and packages of heroin for the customers she found, and arranged cocaine transactions with Cruz. Moreover, Marquez's repeated telephone conversations with Cruz over a lengthy period of time involving numerous drug transactions, and the storage of substantial sums of cash in her apartment, demonstrate Marquez's knowledge of the scope of the conspiracy, and are not indicative of minor or minimal conduct.

### C. *Diminished Capacity*

#### 1. Probation's Determination

The Probation Department did not specifically consider defense counsel's argument for a downward departure based on the defendant's diminished mental capacity in its recommendation to the Court. The Probation Department indicated, however, its belief that such a downward departure was unwarranted. *See* Presentence Report Recommendation.

#### 2. Applicable Law

▪ Section 5K2.13 of the Guidelines provides that in some instances, a downward departure may be appropriate based on diminished capacity:

> If the defendant committed a non-violent offense while suffering from significantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants, a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense, provided that the defendant's criminal history does not indicate a need for incarceration to protect the public.

In order for a court to grant a departure under this Section, a defendant must show not only that he is suffering from a reduced mental capacity, but that there is a causal link between that reduced capacity and the commission of the charged offense. *United*

*States v. Prescott,* 920 F.2d 139, 146 (2d Cir.1990).

### 3. Discussion

■ Upon consideration of (1) Dr. Berger's report and addendum; (2) Dr. Goldstein's report and addendum; (3) Dr. Drob's report; (4) the testimony of Drs. Berger and Goldstein; (5) Marquez's testimony at the *Fatico* hearing; (6) the wiretapped conversations and transcripts, the Court finds that Marquez was not suffering from a reduced mental capacity which contributed to her commission of the offense charged, and thus, a downward departure based on diminished capacity is not appropriate.

Despite the doctors' diagnosis of histrionic personality disorder, Marquez appears to be a woman who has always been very much in command of herself and those around her. In fact, the wiretapped conversations establish that she consistently gave, rather than received orders and directions. *See e.g.,* Government Exhibits 001 (Marquez states to Cruz, "[l]isten, boy, hurry up and bring that 'cause the man came"; "[s]end the photo"), 015 (Marquez states to Cruz, "but when the man answers and I call, don't you come ... send Jose"), 020 (Marquez states to Cruz, "yeah, she wants the photo, but don't you give me those cut up rolls"), 025 (Marquez states to Cruz, "[l]ook faggot! Well bring it"). The taped conversations also indicate that on many occasions it was Marquez who initiated contact with Cruz regarding narcotics dealing by calling him on his beeper. *See e.g.,* Government Exhibits 003, 013, 020. Moreover, the tapes indicate that Marquez knew that she was engaging in illicit drug activity, involving substantial amounts of narcotics, for the purpose of making a substantial profit. Finally, despite any implication to the contrary by the doctors, the Court finds that the wiretapped conversations, as well Marquez's testimony about the conversations, demonstrate conclusively that (1) Marquez was not manipulated or influenced by Cruz; (2) Marquez had the ability to refuse Cruz's requests; and (3) Marquez did not make up drug related responses or fabricate potential narcotics clients in her conversations with Cruz because of a fear of being kidnapped or robbed by Cruz.

Accordingly, Marquez is not entitled to a downward departure based on diminished capacity.

### D. *Acceptance of Responsibility*

#### 1. Probation's Determination

■ In the Presentence Report, the Probation Department assessed a three point reduction for acceptance of responsibility pursuant to the most recent amendment to § 3E1.1(b) of the Sentencing Guidelines. *See* Presentence Report at ¶ 143. The Government objected to the three point decrease, however, claiming that Marquez plead guilty very late in the case, and thus was entitled only to a two point reduction. *See* Second Addendum to Presentence Report. As Marquez continued to maintain that she was entitled to a three point reduction because her plea was the result of ongoing negotiations with the Government, the Probation Department deferred to the Court the issue of whether Marquez should receive the additional one point reduction. *See* Second Addendum to the Presentence Report.

#### 2. Applicable Law

The most recent amendment to the Sentencing Guidelines permits an additional one point reduction (for a total of three points) for acceptance of responsibility under certain circumstances. *See* §§ 3E1.1(b)(1) and (2). Specifically, the amendment to § 3E1.1(b) provides that if a defendant has assisted authorities in the investigation or prosecution of his own misconduct by taking one or more of the following steps:

(1) timely providing complete information to the government concerning his own involvement in the offense; or

(2) timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently,

the offense level should be decreased by 1 additional level. Application Note 6 further explains that in general, "the conduct qualifying for a decrease in offense level under subsection (b)(1) or (2) will occur particularly early in the case."

### 3. Discussion

In this case, Marquez did not assist the authorities by taking either of the above steps. At no time did she provide complete information to the Government concerning her own involvement in the case, nor did she timely notify the government of her intention to enter a guilty plea. Although the defense is correct that there were extensive plea negotiations conducted during the twelve months from the date of Marquez's arrest in May 1991 until her plea, twelve months later in May 1992, these negotiations did not permit the Government to avoid preparing for trial or the Court to allocate its resources efficiently.

First, at the time of Marquez's May 20, 1992 plea, a firm trial date of June 15, 1992 was in place for Marquez's trial, thus necessitating preparation by the Government and scheduling by the Court.

Second, according to the Government, during the months preceding the Marquez plea, the Government responded to Marquez's pretrial motions,[6] prepared witnesses, reviewed summaries of a nine month wiretap, and prepared translations and transcripts of over 175 pages of wiretapped telephone calls. *See* Government's letter to the Court, dated December 31, 1992, at 4.

Third, because Marquez plead to a barebones conspiracy and disputed the Government's view of the amount of heroin involved in the charged conspiracy and related conduct, the Government was forced to present an extensive case at the *Fatico* hearing before the Court.

Accordingly, the Court finds that the defendant is only entitled to a two point reduction for acceptance of responsibility.

### CONCLUSION

Based on the foregoing, the Court finds that:

1. the Base Offense Level is 32;

2. Marquez is not entitled to an adjustment for her role in the offense.

3. Marquez is entitled to only a two point reduction for acceptance of responsibility;

4. Marquez is not entitled to a downward departure based on diminished capacity.

Accordingly, Marquez's Total Offense Level is 30. When this is coupled with a Criminal History Category of I, the resultant guidelines range is 97–121 months. Marquez's sentence will take place on July 28, 1993 at 2:00 p.m.

SO ORDERED.

---

6. The Court issued a 26 page Memorandum Opinion and Order, dated April 21, 1992, with respect to Marquez's pretrial motions.