**UNITED STATES of America, Appellee,**

v.

**Jillian HERNANDEZ, Defendant–Appellant.**

**No. 1282, Docket 95–1604.**

United States Court of Appeals, Second Circuit.

Argued April 2, 1996.

Decided May 10, 1996.

---

**3.** Roy Tellier moved for severance before trial and raises the denial of that motion as a ground for reversal on appeal.

Michael E. Horowitz, Asst. U.S. Atty. for the Southern Dist. of New York, New York City (Mary Jo White, U.S. Atty., Suzanne Jaffe Bloom, John M. McEnany, Asst. U.S. Attys., of counsel), for appellee.

Thomas G. Roth, Fleming, Roth & Fettweis, Newark, NJ, for Defendant–Appellant.

Before OAKES, WINTER, and CALABRESI, Circuit Judges.

CALABRESI, Circuit Judge:

Jillian Hernandez is a former Special Agent of the Drug Enforcement Agency (DEA) who was convicted, following a six-day jury trial, for conspiring to embezzle DEA funds. She challenges the district court's finding that she attempted to obstruct justice. We deem the evidence insufficient to support the district court's conclusion that Hernandez attempted to obstruct justice. Accordingly, we vacate the sentence and remand for resentencing.

### BACKGROUND

Hernandez was charged with conspiracy to embezzle government funds, in violation of 18 U.S.C. § 371, and with conspiracy to possess cocaine and crack cocaine, in violation of 21 U.S.C. § 846. She was convicted of the first and acquitted of the second charge. At trial, the government introduced evidence that Hernandez joined with two of her co-workers, Debbie Prager and Karen Frey, to convert and embezzle, from July 1992 through October 1993, over $20,000 in DEA funds during her employment with the DEA. Prager and Frey were civilian employees in the DEA's budget and accounting section. Their duties included responsibility for maintaining cash "imprest" funds (funds that the DEA used to pay investigative, informant, and other official expenses). Prager's fund was $50,000, and Frey's was $100,000.

Hernandez, Frey, and Prager apparently started by taking rather small amounts of money from the imprest funds. At first, they used this money mainly for entertainment expenses. But, as time passed, they began spending it in other ways. Prager, for example, used it to pay off her large credit card debts. At trial, the government attempted to show that the money also served to finance Hernandez and Prager's alleged drug habits. The government claimed that the two obtained cocaine principally through Jillian Hernandez's uncle, Miguel, and that Hernandez obtained cocaine from a family friend, Armando Fuentes, as well. It sought to show that Hernandez and Prager would usually "cook" the powder cocaine in Hernandez's apartment and smoke it, either alone or in the company of two neighbors, Michael Thomas and Dennis Forsythe.

In the Fall of 1993, Frey sent an anonymous tip to the DEA about Prager's drug use. The DEA gave Prager a surprise drug test on November 1, 1993. Recognizing that her test would turn up positive, Prager immediately asked Frey to cover the shortfall in her imprest account. Frey refused. Prager subsequently informed Hernandez of the drug test. Hernandez, allegedly fearing that she would be tested as well, took sick leave for the entire week. On November 5, Prager's test came back positive. Her accounts were audited and a shortfall of $24,400 was revealed. On November 8, Prager told the authorities that she was involved with Hernandez in embezzling funds and in drug use, and consented to wear a wire while speaking with Hernandez. Eventually, Prager agreed to plead guilty of conspiring to

embezzle government funds, and to testify against Hernandez. Soon after, Hernandez was arrested.

At Hernandez's trial, the government presented some witnesses who testified to her cocaine and crack cocaine consumption, and several witnesses who testified to her embezzlement. As part of her defense, Hernandez called a former supervisor who talked about her job performance at the DEA. She also called two character witnesses. In addition, she introduced into evidence the results of an April 1994 unannounced drug test—a test that she passed. On May 24, 1995, the jury convicted Hernandez of conspiracy to convert funds, but acquitted her of conspiracy to possess cocaine. The next day, the court set sentencing for September 15, 1995.

The presentence report (PSR), written in August of 1995, recommended a total offense level of 14 and a sentencing range of 15 to 21 months, based on a criminal history of I. It arrived at the offense level by finding a base offense level of 4 for embezzlement, adding a six-level enhancement for a loss in excess of $20,000, a two-level enhancement for more than minimal planning, and 2 more points on the ground that Hernandez had abused a position of trust in a manner that significantly facilitated the commission or concealment of the offense. The Probation Department also noted that Hernandez might be subject to an obstruction of justice enhancement for intimidating witnesses.

The government, in a September 1995 hearing before the sentencing court, requested an obstruction of justice enhancement. It contended that Hernandez had attempted to intimidate witnesses on six separate occasions:

● After the case was filed, Hernandez called Frey "the devil" and told Frey that "she would see [her] in court and stare [her] down."

● Hernandez tried to contact Frey on the first day of trial.

● Armando Fuentes, who told the grand jury that he sold cocaine to Hernandez on several occasions, recanted his testimony at trial. Fuentes admitted that he had spoken with Hernandez's uncle, Jose, the week before the trial.

● Hernandez "scream[ed] and holler[ed]" at Michael Thomas, her neighbor, after he informed her that he had told the grand jury about the crack that they had allegedly consumed together.

● Witnesses Michael Thomas and Dennis Forsythe received a threatening tape-recorded message on their answering machine on May 28, 1995, four days after Hernandez was found guilty of embezzlement. In the message, a male voice said: "We heard you are rats. You rat out people. You rat out people and rats gotta die. We gonna come visit you. Bye."

● On July 26, 1995, two months after trial, but before sentence, Hernandez saw Michael Thomas in their apartment building and yelled "die, die, die."

On the basis of the above incidents, the district judge found that Hernandez had obstructed justice. Specifically, he stated:

I find a willful intent to obstruct justice here by the defendant in conjunction with her family. I find that by clear and convincing evidence as to Karen Frey what we heard, as to Mr. Thomas on what was heard before, what was heard after, what is heard on the tape recording as to Mr. Fuentes through the family a week before he took the witness stand, and it is all part of the package. And I don't see the Fuentes incident as being ... Uncle Jose just out of the blue saying "I'm going to do my niece a favor and make that phone call." [T]hat is part of a plan to do that, and it is absolutely overwhelming proof.

Judge Owen found the obstruction of justice "absolutely shocking." He stated that it was among the worst he had ever seen, and imposed a two-level enhancement for it. He rejected the PSR's recommendation of a two-level enhancement for abuse of trust. He then sentenced Hernandez to 21 months (the top of the 15–21 month range for her offense). Hernandez appeals from the district court's finding of obstruction of justice.

## DISCUSSION

█ The Sentencing Guidelines provide for a two-level enhancement "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." U.S.S.G. § 3C1.1. The enhancement encompasses "threatening, intimidating, or otherwise unlawfully influencing a ... witness ... or attempting to do so." Id. cmt. 3(a). For an obstruction of justice to be found, a court must establish that the defendant had the specific intent to obstruct justice. In other words, there must be a finding that the defendant "consciously act[ed] with the *purpose* of obstructing justice." *United States v. Rivera,* 971 F.2d 876, 894 (2d Cir. 1992) (citation and internal quotation marks omitted). And Application Note 1 to U.S.S.G. § 3C1.1 requires a sentencing court, in determining whether an obstruction of justice occurred, to read "statements by the defendant ... in a light most favorable to the defendant." In general, the question of whether an obstruction of justice took place is one to be decided by a preponderance of the evidence, but we have suggested that as to statements governed by Application Note 1 to U.S.S.G. § 3C1.1, the standard "sounds to us indistinguishable from a clear-and-convincing" one. *United States v. Onumonu,* 999 F.2d 43, 45 (2d Cir.1993).[1] Once a court finds that obstruction of justice took place, however, the two-level enhancement is mandatory. *United States v. Friedman,* 998 F.2d 53, 58 (2d Cir.1993).

█ We review the district court's determination of all the facts concerning obstruction of justice for clear error. *Rivera,* 971

F.2d at 893–94. But we review the question of whether such facts comprise an obstruction of justice *de novo.* *Id.* ("The sentencing court's findings of fact regarding the obstruction of justice enhancement are subject to the clearly erroneous standard, while its ruling that the established facts constitute obstruction of justice, which involves legal interpretation of a Guidelines term, is reviewed *de novo,* with due deference to the sentencing court.").

█ Applying these precepts, we hold that the district court's determination that Hernandez sought to obstruct justice cannot stand. The court's factual determination that Hernandez was responsible for the tape-recorded threat made to Thomas and Forsythe, and for Fuentes's switch in testimony, was clearly erroneous. And its legal conclusion that the incidents, taken together, amounted to an obstruction of justice was also in error. The incidents to which the government points simply do not establish—either singly or jointly—that *Hernandez* was seeking to intimidate witnesses.

█ 1. Before trial, Hernandez called Frey "the devil" and stated that she would "stare" Frey "down" at trial. But, as the government virtually conceded at oral argument, these utterances hardly amount to a threat. Even if this conversation "intimidated" Frey and made her "scared," there is no evidence that Hernandez made the statements with the requisite *intent* to obstruct justice. Taking the statements to Frey in the light most favorable to Hernandez, what Hernandez said was not an obstruction of justice.[2]

---

1. We are not sure that reading statements in the light most favorable to the defendant is, in fact, equivalent to imposing a clear and convincing standard. It is equally possible that Application Note 1 only requires that ambiguities of a defendant's statement be read in favor of the defendant, and that, once so read, the question of whether an obstruction of justice occurred is to be resolved by no more than a preponderance of the evidence.

In any event, on the facts of this case our result would hold regardless of whether the standard was a preponderance of the evidence or a clear and convincing one.

2. Of course, the Guidelines "do[] not preclude a finding of a threat any time the defendant can conjure up some conceivable alternative explanation for his words," *United States v. Shoulberg,* 895 F.2d 882, 885 (2d Cir.1990). In this case, however, it is the government, not the defendant, who has "conjure[d] up" an interpretation. Defendant's claim, that she called Frey "the devil" to let Frey know "what she thought of her former friend, who would call her three to five times per week, pretend to be her friend and then surreptitiously report those conversations back to [Office of Professional Responsibility] inspectors," is not the type of far-fetched interpretation of a defendant's statement that *Shoulberg* addresses.

2. Hernandez sought to communicate with Frey on the first day of trial. Without some showing of evil intent as to that attempted contact, however, this fact cannot constitute any evidence at all of obstruction.

3. The district court made much of the fact that Fuentes recanted his testimony at trial. The fact of a recantation may, in appropriate circumstances, give rise to an inference of intimidation. And there is no doubt that Fuentes's testimony at trial deviated from his earlier testimony to the grand jury. There is likewise no doubt that Fuentes had spoken with Hernandez's uncle, Jose, the week before the trial. But the government has presented no evidence regarding the substance of the conversation between Fuentes and Jose. Moreover, and most important, it has made no showing at all that links Hernandez to any part of the Fuentes episode. Even if we assume that the uncle tried to intimidate Fuentes, there is nothing that indicates that the defendant even knew of, let alone was in any way responsible for, the uncle's alleged actions.[3]

4. Like the defendant's shouts at Frey, her "screaming and hollering" at Michael Thomas when she first learned that Thomas had testified against her shows no more than fury. Fury may be exceedingly unpleasant, but alone, it bespeaks no intent to obstruct justice.

5. Four days after Hernandez was convicted, Michael Thomas and Dennis Forsythe received a threat on their answering machine. This could certainly amount to an attempt to obstruct justice. The defendant claims that the fact that the message was left after the trial and conviction forecloses the possibility that it was intended to obstruct justice. The Guidelines provide for an enhancement for an obstruction related to sentencing. *See* U.S.S.G. § 3C1.1. We need not reach the issue of whether this tape-recorded message was so intended because nothing connects the defendant to the threat. The only possible link is the fact that the defendant had recently been convicted of embezzlement in part as a result of the testimony of those to whom the threat was addressed. That cannot be enough. There must be some acts or words on the defendant's part to support an inference that she was involved in the phone call. The government has never even tried to argue that Hernandez was, herself, directly responsible for the threat. Nor has it made any showing to connect her to plausible threateners. Under the circumstances, we do not believe that the tape-recorded threat can suffice as evidence against her.

6. The only evidence regarding the defendant that might come close to showing intimidation or attempted intimidation on her part is her post-trial statement to Michael Thomas (made approximately two months after the anonymous tape-recorded threat), "die, die, die." But once this statement is taken in the light most favorable to Hernandez—as it must be under Application Note 1 of the Guidelines—it becomes impossible to conclude that the words were stated with an intent to obstruct justice. It may very well be that Hernandez wished Thomas dead, and the sooner the better. But that is a very long way from showing that she made the statement in order to get him to change his testimony at the sentencing hearing.

Taking all six of the allegedly obstructive statements together, moreover, does not bring us any closer to the district court's conclusion. Were there evidence showing that the defendant had tried to intimidate witnesses, the court might have been justified in inferring that she had also been involved in those threats which clearly were made, but whose source was unknown. There was, instead, no such evidence. And a smattering of very ambiguous statements made by her, coupled with one patent, and one possible, threat on the part of others, does not, unless these threats are in some other way linked to the defendant, add up to

---

**3.** Because Application Note 1 only requires a sentencing court to evaluate "alleged false testimony or statements *by the defendant* ... in a light most favorable to the defendant," U.S.S.G. § 3C1.1 n. 1 (emphasis added), we would not apply this generous rule of construction to statements made by others, such as the defendant's uncle. But before we can construe language, generously or otherwise, we must have some language to construe. We need—at the very least—some inkling of what was said.

an obstruction of justice by her. Under the circumstances, it was error to hold her responsible for the tape-recorded threat and for Fuentes's recantation.

### CONCLUSION

We have examined all of the remaining evidence, and conclude that the district court erred by imposing a two-level enhancement for obstruction of justice. We therefore vacate the sentence and remand for resentencing.[4]

---

4. In the last sentence of her brief, defendant suggests that this Court should not remand the case and should impose a ten-month term of imprisonment. We see no reason to do so and we believe that the appropriate course of action is to remand to the district court for further proceedings.