**UNITED STATES of America,
Appellee,**

v.

**Sofwat KHEDR, Defendant,**

**Abdullah Alhumoz, Defendant–
Appellant.**

**Docket No. 02–1354.**

United States Court of Appeals,
Second Circuit.

Argued: Feb. 28, 2003.

Decided: Sept. 5, 2003.

Roland R. Acevedo, Seiff, Kretz & Maffeo (Thomas Eddy, on the brief), New York, NY, for Defendant–Appellant.

Jo Ann M. Navickas, Assistant United States Attorney for the Eastern District of New York (David C. James, Assistant United States Attorney, of counsel; Roslynn R. Mauskopf, United States Attorney, on the brief), Brooklyn, NY, for Appellee.

Before: STRAUB, KATZMANN, and RAGGI, Circuit Judges.

Judge RAGGI concurs in part and dissents in part in a separate opinion.

STRAUB, Circuit Judge.

Defendant–Appellant Abdullah Alhumoz appeals from a judgment of the United States District Court for the Eastern District of New York (Nina Gershon, *Judge*) convicting him, following a jury trial, of conspiring to commit bank and credit card fraud in violation of 18 U.S.C. § 371. Alhumoz is a used-car dealer in Brooklyn who was involved in a scheme to make money by securing auto loans for customers and cars that did not exist. He argues on appeal that his conviction should be reversed because he received ineffective assistance from his trial counsel. Alhumoz also asserts that the District Court improperly enhanced his sentence for (i) obstructing justice and (ii) receiving more than $1 million in "gross receipts" from his crime. We decline to address the ineffective-assistance claim, and affirm the District Court's application of the gross-receipts sentencing enhancement, but hold that there was insufficient evidence to support the application of the obstruction-of-justice enhancement to Alhumoz's sentence. We therefore remand for resentencing on this limited ground.

## BACKGROUND

In January 2002, Alhumoz was tried in the Eastern District of New York for conspiracy to commit bank fraud and credit card fraud, together with co-defendant Safwat Khedr, a merchant who participated in a related scheme. The charges against Alhumoz arose out of his participation in a scheme led by an acquaintance, Mustafa Yassin, who later cooperated with the government and testified against Alhumoz at trial. Yassin recruited and paid

"customers" to give him their Social Security numbers, birthdates, and other personal information. Yassin used the information for his credit card schemes and also gave the information to Alhumoz, who used it to apply for fraudulent car loans on the Internet. Whenever a loan was granted, Yassin brought the check to Alhumoz, who cashed the check, paid part of the proceeds to Yassin, and kept the remainder for himself. The car loans were never repaid.

Yassin's trial testimony about the scheme was corroborated by another cooperating witness, Salaheldin Fawzy, who testified that he was recruited to be a "customer" by Yassin, that Alhumoz applied for a car loan in Fawzy's name, and that he had carried money from Alhumoz to Yassin on several occasions. Both witnesses' testimony was corroborated by excerpts of a conversation that Fawzy recorded with Alhumoz in which Alhumoz discussed his unsuccessful attempt to obtain a car loan in Fawzy's name.

In addition, the government introduced bank files relating to 21 car loan applications that had been submitted over the Internet. All but one of the applications were submitted in cooperating witness Yassin's name, the name of one of his aliases, or a name that Yassin identified at trial as one of his customers. Evidence adduced at trial demonstrated that the vehicle identification numbers listed in the loan application materials were either invalid or used for more than one loan, and the car dealerships listed on the applications did not exist at the addresses listed.

The government connected Alhumoz to these 21 fraudulent loan applications through several pieces of physical evidence. A computer seized from Alhumoz's apartment held files relating to the e-mail addresses used to submit the applications, along with information for "Qamar Eche-

varria," an alias that Alhumoz admitted he used. Of the nine loan checks introduced at trial, three carried Alhumoz's fingerprints, and one of the loan checks had Alhumoz's telephone number written on the face of the check. Further, invoices for two of the dealerships listed on the fraudulent loan applications were found in Alhumoz's possession, while blank invoices and corporate records for these dealerships, along with uncashed car loan checks, were found at apartments used by Alhumoz.

After a seven-day trial, Alhumoz was convicted of conspiring to commit bank fraud and credit card fraud in violation of 18 U.S.C. § 371. He was sentenced to five years' imprisonment and three years' supervised release, and ordered to pay restitution in the amount of $453,400. He is currently serving his sentence.

Alhumoz appeals his conviction, arguing that it is constitutionally infirm because he was provided ineffective assistance of counsel. He also challenges the application of two enhancements to his sentence, arguing that the District Court erred in increasing his sentencing range based on "gross receipts" totaling more than $1 million from his crime, and obstruction of justice.

## DISCUSSION

### I. Ineffective Assistance

■ Defendant's primary challenge to his conviction is that he received ineffective assistance of counsel at trial in violation of the Sixth Amendment, and should therefore receive a new trial. Although defendant has had new counsel representing him at sentencing and on appeal, this court has expressed a "baseline aversion to resolving ineffectiveness claims on direct review." *United States v. Williams*, 205 F.3d 23, 35 (2d Cir.) (quoting *United*

*States v. Salameh,* 152 F.3d 88, 160–61 (2d Cir.1998)), *cert. denied,* 531 U.S. 885, 121 S.Ct. 203, 148 L.Ed.2d 142 (2000). Among the reasons for this preference is that the allegedly ineffective attorney should generally be given the opportunity to explain the conduct at issue. *See Sparman v. Edwards,* 154 F.3d 51, 52 (2d Cir.1998) (per curiam). This court has, however, entertained ineffective assistance claims for the first time on direct appeal when their "resolution is 'beyond any doubt' or to do so would be in the interest of justice." *United States v. Matos,* 905 F.2d 30, 32 (2d Cir.1990) (quoting *United States v. Aulet,* 618 F.2d 182, 186 (2d Cir.1980)).

The Supreme Court recently had occasion to remind us that "in most cases a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective-assistance." *Massaro v. United States,* —— U.S. ——, 123 S.Ct. 1690, 1694, 155 L.Ed.2d 714 (2003). In *Massaro,* the Supreme Court indicated that ineffective-assistance claims should ordinarily "be litigated in the first instance in the district court, the forum best suited to developing the facts necessary to determining the adequacy of representation during an entire trial." *Id.* Accordingly, the Supreme Court explained, few ineffective-assistance claims "will be capable of resolution on direct appeal." *Id.* at 1695. Consistent with this approach, we decline to address the ineffective assistance claim on this direct appeal.

## II. Gross Receipts Enhancement

Alhumoz also challenges two issues related to his sentence. The first challenge is to the District Court's application of four additional levels to his base sentencing level, pursuant to U.S.S.G.

§ 2F1.1(b)(7)(B),[1] because Alhumoz derived more than $1 million in "gross receipts" from the crime.

### A. Standard of Review

 The government argues that Alhumoz waived his objection to the inclusion of these loans by failing to object at sentencing, and specifically agreeing to the government's representation that approximately $1.7 million was the "actual loss amount" attributable to defendant's crime. Although defendant did not contest the "actual loss" calculation for purpose of U.S.S.G. § 2F1.1(b)(1)(N), he did object to the government's contention that he should receive a sentencing enhancement pursuant to U.S.S.G. § 2F1.1(b)(7)(B) for having derived more than $1,000,000 in "gross receipts" from his crime. Therefore, this challenge was not waived.

 Nonetheless, it is undisputed that defendant did not specifically object to the particular loans—$186,000 borrowed from the companies Peoplefirst.com and Giggo.com—that he now challenges on appeal, and therefore his challenge is subject to "plain error" review. *See* Fed.R.Crim.P. 52(b). Defendant argues that this challenge should be reviewed under a less rigorous standard based on *United States v. Sofsky,* 287 F.3d 122, 125–26 (2d Cir. 2002), because he did not receive prior notice of the fact that the companies did not claim that they actually lost money on the loans. Although defendant did have prior notice that these loans were being attributed to him as part of the "gross receipts" calculation, he claims in his brief on appeal that he did not know that these companies were not claiming losses on these loans until he was handed the Third

---

1. The 1998 Guidelines Manual was used to calculate Alhumoz's sentence. In the 2002 version of the Guidelines, this enhancement is found at U.S.S.G. § 2B1.1(b)(12)(A), and results in an increase of only two levels.

Addendum to the PSR, only minutes before the sentencing proceeding in District Court was to begin. We need not decide, however, whether this circumstance warrants application of a more relaxed plain error standard, *see id.* at 125, because we conclude that the District Court's application of this enhancement was proper under any standard.

### B. *Application of Enhancement*

■ Under § 2F1.1(b)(7)(B), the District Court is to provide a four-level enhancement to a defendant's offense level if the offense "affected a financial institution and the defendant derived more than $1,000,000 in gross receipts from the offense." At sentencing, the government argued that defendant was responsible for borrowing $1,718,000 in phony auto loans, and that defendant received 60 percent of the face value of these loans, or $1,031,085. The 60 percent figure was arrived at after deducting the 10 percent the defendant gave various vendors to cash the checks, and the 30 percent that defendant gave to co-conspirator Mustafa Yassin. Defendant argues that without the $186,000 in loans from Peoplefirst.com and Giggo.com, the $1,031,085 in "gross receipts" would fall below the $1 million threshold. We reject the claim for two reasons.

First, we believe that the $186,000 was properly included. The term "gross receipts" is defined in the Guidelines with reference to 18 U.S.C. § 982(a)(4), which indicates that " '[g]ross receipts from the offense' includes all property, real or personal, tangible or intangible, which is obtained directly or indirectly as a result of such offense." Application Note 18 to

§ 2F1.1 (citing 18 U.S.C. § 982(a)(4)). That the companies did not claim a loss does not mean that the loans are not "property ... obtained" by Alhumoz as a result of the offense. Put simply, Alhumoz received a check from these companies because he submitted fraudulent loan applications; he does not claim that he never received these checks, or that he paid the money back. As the District Court put it, "it is not at all clear to me why the face value of the checks, which were sent to this defendant, doesn't in itself completely establish that the gross receipts to this defendant were the 1.7 million dollars." [2]

Second, even if defendant is correct that the $186,000 should not have been included, we agree with the government that, if anything, the District Court's ultimate calculation may actually understate Alhumoz's "gross receipts" because it is not clear that the 10 percent fee to the checkcashers should have been deducted. As the District Court put it:

> I hardly think ... that the amount a defendant pays to negotiate a check ought to be deducted anymore than if he put these in his own bank account and the bank charged him $50 a month for his checking services or 50 cents a check for deposit ought to be deducted from his gross receipts.

*See, e.g., United States v. Bennett,* 161 F.3d 171, 193 (3d Cir.1998) (rejecting defendant's argument that he did not receive all the funds "individually" because he subsequently transferred much of the money to consultants and others), *cert. denied,* 528 U.S. 819, 120 S.Ct. 61, 145 L.Ed.2d 53 (1999). In short, "gross receipts" is not

---

**2.** *But see* Application Note 18 to § 2F1.1 (" 'The defendant derived more than $1,000,000 in gross receipts from the offense,' as used in subsection (b)(7)(b), generally means that the gross receipts to the defendant individually, rather than to all participants,

exceeded $1 million."); *United States v. Millar,* 79 F.3d 338, 346 (2d Cir.1996) (remanding to the District Court for findings on the amount of gross receipts defendant derived "individually—not jointly—from the offense").

the equivalent of "net profits," and, if properly calculated as 70 percent of either $1.7 million or, excluding the People-first.com and Giggo.com loans, $1.5 million, Alhumoz's share would be safely over the $1 million threshold. We agree with and adopt the District Court's reasoning, and therefore affirm the application of the enhancement for gross receipts totaling more than $1 million.

### III. Obstruction–of–Justice Enhancement

#### A. The Relevant Standards

■ We subject an obstruction-of-justice enhancement to a mixed standard of review. See United States v. Cassiliano, 137 F.3d 742, 745 (2d Cir.1998). "The sentencing court's findings as to what acts were performed, what was said, what the speaker meant by her words, and how a listener would reasonably interpret those words will be upheld unless they are clearly erroneous. A ruling that the established facts constitute obstruction or attempted obstruction under the Guidelines, however, is a matter of legal interpretation and is to be reviewed de novo, giving 'due deference to the district court's application of the guidelines to the facts.'" Id. (quoting 18 U.S.C. § 3742(e) (1994)) (internal citations omitted).

■ The § 3C1.1 enhancement for obstruction is to be imposed only if the obstruction, or attempted obstruction, was "willful[ ]." Because that term "implies a mens rea requirement," United States v. Reed, 49 F.3d 895, 900 (2d Cir.1995), we have generally limited the application of the Guideline to those cases in which "the defendant had the specific intent to obstruct justice." United States v. Hernandez, 83 F.3d 582, 585 (2d Cir.1996); see also United States v. Stroud, 893 F.2d 504,

507–08 (2d Cir.1990). In some cases, however, conduct may be "so inherently obstructive of the administration of justice" that the enhancement should be applied if the defendant deliberately engaged in that conduct, regardless of her specific purpose. See United States v. Reed, 88 F.3d 174, 178 (2d Cir.1996) (intentional failure to appear for sentencing).

■ The facts necessary to support an obstruction-of-justice enhancement need be proven only by a preponderance of the evidence. See Hernandez, 83 F.3d at 585. In determining the intent with which a defendant acted, a district court is entitled to rely on circumstantial evidence and on all reasonable inferences that may be drawn from all of the evidence. See United States v. Sisti, 91 F.3d 305, 313 (2d Cir.1996).

#### B. Application of Standard to the Facts of this Case

■ The factual basis for the obstruction-of-justice enhancement was as follows: According to the trial testimony of the investigating FBI agents, Alhumoz was arrested in an office in Brooklyn while working on a laptop computer, with numerous documents in the office. The morning after his arrest, while he was in custody awaiting arraignment, the agents returned to the office. They entered with the key that Alhumoz had given them upon arrest, and noticed that many of the documents were missing. A few of the agents stayed at the office to conduct surveillance, and later saw a person approaching in a green Cadillac. The person got out of the car, looked around, and started to enter the office with a key. The agents approached him, and they detained and questioned him. He identified himself as Feras Abu Foudeh, acknowledged that the office be-

longed to his uncle,[3] and told the agents that an individual named Mohammed had sent him to clean out the office so that it could be rented. Foudeh gave conflicting answers to the agents about whether he had been at the office the previous evening, and whether he had removed anything from the office the previous evening. While Foudeh was speaking to the agents, Mohammed paged him several times.

With Foudeh's consent, the agents then searched his car, and found a purse with Alhumoz's passport and $47,500 in cash, as well as various papers. The agents then went to Foudeh's apartment, also with his consent, and found a laptop computer that Foudeh acknowledged had been in Alhumoz's office the day before.

Alhumoz's Presentence Report erroneously stated that Foudeh "informed the FBI agents that the *defendant* instructed him to clean out the office space." (emphasis added). It was on that basis that the Probation Department initially recommended that Alhumoz receive a sentencing enhancement for obstructing justice. At the sentencing hearing, after that mistake was corrected, the government argued that Alhumoz should nonetheless receive the obstruction-of-justice enhancement based on two other theories: (i) that the defendant should be held accountable for the obstruction of co-conspirator Mohammed pursuant to U.S.S.G. § 1B1.3, and alternatively, (ii) that the defendant himself obstructed justice. The District Court rejected the first theory, and accepted the latter, in a ruling which concluded:

> I do, however, find sufficient evidence to conclude that the defendant himself did specifically intend to obstruct justice. The defendant had been observed working at a computer in the office in ques-

tion from which the evidence, evidence relevant to this case, was removed. That office had been secured by the agents with the defendant's knowledge and the key to that, the door of the office had been given to the agents and Agent Rothe's testimony at the trial established that. Later this person we're calling a cousin of the defendant (Foudeh) arrived at the office in the defendant's personal vehicle which contained the defendant's passport, a large sum of cash among other things and he was seen attempting to enter the rear door of that office. He (Foudeh) later admitted that he had removed a laptop from the office claiming that it was his laptop that he had lent to the defendant. He described the office as his uncle's office or, for our purposes, his cousin's office and he said he went there to clean it out because he was thinking of renting it from his uncle or cousin.

This action on the part of this person clearly suggests that it was the defendant who had an interest in having this office cleaned out of the evidence that might prove his guilt at trial and was responsible for it. The defendant here relies on the fact that this cousin of the defendant said it was Mohammed who had sent him to the office but the circumstantial evidence is ample to support the inference that if it was Mohammed who sent him, Mohammed did so not just on the defendant's behalf, as the uncle made threats to witnesses in the *Hernandez* case, but specifically at the defendant's direction. It is highly improbable that the cousin would have entered what he knew was the defendant's office and removed the computer he had lent to the defendant, used the defen-

---

**3.** There appears to be some confusion about whether Alhumoz is Foudeh's uncle or cousin. For the purpose of this opinion and con-

sistent with the parties' submissions on appeal, we will refer to Foudeh as Alhumoz's cousin.

dant's own personal car, which had in it the defendant's passport and a large sum of money, at the direction of Mohammed if this cousin were not confident that any direction from Mohammed was made at the defendant's request. It was also, of course, the defendant who was facing criminal charges at this time.

The District Court's findings constitute, for our purposes, the "established facts"— that Alhumoz was working on a laptop when arrested, that the FBI agents saw Alhumoz's cousin approach the office the next day in Alhumoz's car, which contained Alhumoz's passport and nearly $50,000, and that the laptop was gone from the office and later found in Foudeh's apartment. The question is whether those "established facts" constitute "obstruction . . . under the Guidelines" by this defendant, or more specifically, whether those "established facts" are sufficient to prove by a preponderance of the evidence the "willful" *mens rea* requirement of U.S.S.G. § 3C1.1 as to Alhumoz. *Cassiliano*, 137 F.3d at 745. For the reasons that follow, we conclude that there was insufficient evidence that Alhumoz had the "specific intent" to obstruct justice to warrant the application of this enhancement.

First, as suspicious as it may appear at first glance, the significance of the fact that Alhumoz's cousin, Foudeh, was driving Alhumoz's car, with his passport and money in it, should not be overstated. Alhumoz's wife testified at trial that she had given Foudeh her purse containing the bail money, taken from a safe-deposit box, and Alhumoz's passport after she went to go see Alhumoz's lawyer. This evidence was never contradicted or discredited in any way by the government or the District Court, and the FBI agent who searched the car confirmed at trial that the money was found in a purse containing the driver's license of Alhumoz's wife.

Second, although the District Court concluded that Foudeh was acting at Alhumoz's direction, there were any number of equally plausible explanations for why Foudeh removed the laptop from the office: (1) he was telling the truth, and the computer did belong to him; (2) Foudeh may have been acting in what he believed was his cousin's best interest (but not at Alhumoz's direction); (3) Foudeh himself may have played a peripheral role in the conspiracy, although he was not charged, and had his own reasons for removing evidence; or (4) Mohammed directed the removal for his own reasons—as defense counsel suggested at trial, he may well have been one or more of the phony customers in the auto loan scheme, and he did page Foudeh several times while Foudeh was speaking with the agents.

Under any of these scenarios, Alhumoz did not have the specific intent to obstruct justice. We underscore that the existence of alternative explanations would not matter were there evidence of words or conduct by the defendant from which to draw an inference that he specifically intended to obstruct justice. Indeed, it is well-established that "the task of choosing among competing, permissible inferences is for the fact-finder, not for the reviewing court." *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir.2001).

If there was circumstantial evidence such as a phone call from Alhumoz to Mohammed or Foudeh shortly before Foudeh's visit to the office, for example, we would be inclined to affirm the enhancement, even if there was no evidence as to what was said. But the evidence linking the defendant to the obstruction is significantly less than in prior cases where we have affirmed the application of the en-

hancement.[4] Indeed, in some of our cases *reversing* the application of the obstruction-of-justice enhancement, the government had more evidence of "specific intent" to obstruct justice by the defendant than has been introduced in this case.[5] In this sense, we view this case as similar to *Hernandez,* where we specifically relied on the fact that there was nothing to indicate that the "defendant even knew of, let alone was in any way responsible for," his uncle's alleged obstruction. 83 F.3d at 586. Accordingly, the enhancement should not have been applied.

## CONCLUSION

For the reasons stated, we decline to address the ineffective-assistance claim, and affirm the application of the gross receipts enhancement to his sentence, but remand for resentencing on the ground that the obstruction-of-justice enhancement should not have been applied. The

motion for bail pending appeal is denied as moot.

RAGGI, Circuit Judge, concurring in part and dissenting in part.

I concur in the court's opinion insofar as it (1) declines to address Alhumoz's challenge to the effectiveness of his trial counsel and (2) affirms a sentencing enhancement for gross receipts of more than $1 million. I respectfully dissent, however, from Part III, which concludes that the district court clearly erred when it enhanced Alhumoz's sentence for obstruction of justice pursuant to U.S.S.G. § 3C1.1. Specifically, I disagree with the majority's view that there is no evidence in this case of "words or conduct by the defendant" supporting "an inference that he specifically intended to obstruct justice." [*See ante* at 104.] While direct evidence of words or conduct may be lacking, there is considerable circumstantial evidence supporting an inference of obstructive conduct by Alhu-

---

4. *See United States v. Feliz,* 286 F.3d 118, 119–21 (per curiam) (2d Cir.2002) (defendant's friends told police that defendant asked them to corroborate his false alibi in the event that he was arrested; sufficient to support willful obstruction of justice); *United States v. White,* 240 F.3d 127, 138 (2d Cir.2001) (affirming enhancement based on narcotics defendant's conduct at time of his arrest, when he told his girlfriend that she should tell police drugs were hers); *United States v. Carty,* 264 F.3d 191, 194–95 (per curiam) (2d Cir. 2001) (finding that defendant fled to and remained in the Dominican Republic in order to avoid sentencing was sufficient to support the enhancement); *United States v. Lincecum,* 220 F.3d 77, 79–81 (2d Cir.2000) (per curiam) (affirming enhancement based on false affidavit defendant submitted to the court); *United States v. McKay,* 183 F.3d 89, 92–95 (2d Cir. 1999) (affirming application of the enhancement in part based on defendant's lying to probation officer about his role in the drug distribution activities in order to affect his sentence); *Cassiliano,* 137 F.3d at 747 (affirming obstruction-of-justice enhancement where defendant "made assiduous efforts to

reach [potential witness], with the admitted purpose of … alerting him [to the investigation] and asking him whether she should lie to the FBI" and in part to "prevent the collection of any further evidence").

5. *See, e.g., Hernandez,* 83 F.3d at 584–87 (reversing District Court's finding of obstruction-of-justice, although government had presented evidence of six separate incidents of attempted witness intimidation); *United States v. Williams,* 79 F.3d 334, 336–37 (2d Cir. 1996) (false story given to officer following arrest in an effort to disassociate himself from co-conspirator was insufficient to support the enhancement); *United States v. Perdomo,* 927 F.2d 111, 117–18 (2d Cir.1991) (reversing and remanding for further fact-finding on application of the obstruction-of-justice enhancement in part because it was "as possible" that defendant directed co-conspirator "to place the cocaine under a car because that was its drop-off point as it is that he was attempting to thereby conceal the cocaine from law enforcement officers," even though defendant knew law enforcement officers were following them).

moz. Indeed, the district court made a specific factual finding of such conduct, ruling that a computer was moved from Alhumoz's office "specifically *at the defendant's direction*," and with his specific intent "to obstruct justice." Sentencing Trans., May 30, 2002, at 29–30 (emphasis added).

Preliminary to discussing this circumstantial evidence, I note that this appeal does not require us to engage in *de novo* review of whether the conduct at issue constitutes obstruction of justice under § 3C1.1. *See United States v. Cassiliano*, 137 F.3d 742, 745 (2d Cir.1998) (holding that whether established facts constitute obstruction under the sentencing guidelines is "a matter of legal interpretation"). If, in the hours immediately following his April 19, 2000 arrest, Alhumoz did willfully direct another person to remove a computer from his office with the specific purpose of thereby concealing information material to his fraud prosecution, there is no question that such conduct would constitute obstruction of justice under the sentencing guidelines. *See* U.S.S.G. § 3C1.1 & Application Note 4(d). Thus, the issue we review is simply whether there was sufficient evidence to support the district court's finding of conduct by the defendant to support the obstruction enhancement.

Our review of a district court's factual findings is necessarily deferential, and we can reverse only for clear error. *See* 18 U.S.C. § 3742(e); *United States v. Cassiliano*, 137 F.3d at 745 (and cases cited therein). To reject a finding of fact as clearly erroneous, we must, upon review of the entire record, be "left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948); *accord United States v. Hendrickson*, 26 F.3d 321, 339 (2d Cir.1994). In considering whether a disputed point has been proved, we bear in mind that the law draws no distinction between direct and circumstantial evidence. *See United States v. Glasser*, 443 F.2d 994, 1006–07 (2d Cir.1971). Indeed, issues such as knowledge and intent are rarely proved by direct evidence and may properly be inferred from the totality of the circumstances. *See United States v. Sisti*, 91 F.3d 305, 313 (2d Cir.1996). Further, in the application of the sentencing guidelines, relevant facts need be proved only by a preponderance of the evidence. *See United States v. Thorn*, 317 F.3d 107, 117 (2d Cir.2003). In sum, we must affirm the obstruction enhancement in this case unless the totality of the evidence leaves us with the "definite and firm conviction" that the district court could not reasonably have concluded that it was "more likely true than not true" that Alhumoz directed the April 19, 2000 removal of a computer from his office specifically intending thereby to conceal material evidence from investigating authorities. *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir.1997) (quoting 4 L. Sand, *Modern Federal Jury Instructions* ¶ 73.01, at 73–4 (1997) (for definition of preponderance standard)). Unlike my colleagues, I find no clear error in the district court's factual findings.

Among the facts known to the district court were the following: (1) the computer at issue contained data incriminating Alhumoz in the charged fraud scheme; (2) Alhumoz, who was working on the computer at the time of his arrest, knew that the machine contained this highly incriminating evidence; (3) Alhumoz also knew that the agents had not taken the computer with them when they left his office sometime after 7:00 P.M. on April 19 but, rather, had secured the office in anticipation of a subsequent search, most likely to occur the following day; (4) the computer was missing from Alhumoz's office when agents returned to the site on April 20; (5) the

person who removed the computer from the office sometime on the night of April 19 was Alhumoz's relation, Feras Abu Foudeh; (6) Foudeh told agents that the computer belonged to him, that he had loaned it to Alhumoz, but that he did not know what Alhumoz used it for, i.e., he did not know that it contained incriminating information; (7) Foudeh returned to defendant's office on April 20, at which time he was driving Alhumoz's Cadillac and was in possession of $50,000 in cash and Alhumoz's passport, the latter two items having been retrieved that morning by Alhumoz's wife from the couple's safety deposit box to help Alhumoz secure release on bail; and (8) when questioned by federal agents on April 20, 2000, about his presence at Alhumoz's office, Foudeh provided inconsistent answers.[1] Moreover, no evidence implicated Foudeh in Alhumoz's fraudulent activities.

From this evidence, the district court could reasonably have inferred that it was more likely than not that Alhumoz had directed the removal of the computer from his office on the night of April 19, 2000. The April 19 arrest certainly gave Alhumoz a strong motive to prevent the computer from falling into the hands of federal authorities.[2] Further, the evidence indicated that on the night of April 19, Alhumoz singularly possessed the knowledge that arresting agents had not yet seized the computer but would likely do so the following day when they planned a full search of his office. In short, Alhumoz, better than any other person associated with this case, knew that successful concealment of the computer could not wait until April 20 but demanded prompt action on the night of April 19.

Further, the district court could reasonably have concluded that Alhumoz, although incarcerated, had the means—namely, his cousin Foudeh—to effect timely obstruction. The court could reasonably infer a close relationship between Alhumoz and Foudeh, based upon Mrs. Alhumoz's entrusting Foudeh on April 20 with her husband's car, her own purse, and the cash and passport intended to secure Alhumoz's bail release.

Finally, from her considerable experience with detained defendants, the district judge could reasonably have concluded that, once lodged for the night, Alhumoz had the telephonic opportunity to contact Foudeh either directly or through an intermediary. Certainly, nothing suggests that Foudeh likely learned of Alhumoz's arrest on April 19 from any other source. The

---

1. For example, Foudeh initially told the agents that he had come to the office to clean it out so that he could rent it from Alhumoz. He subsequently stated that he had come at the direction of a man known to him as "Mohammed" and that he expected Mohammed to meet him at the office later in the day to pick up the garbage cleared out by Foudeh. The agents had reason to believe that "Mohammed" was Mohammed Ali, a subordinate of Mustafa Yassin, who, like Alhumoz, was then under arrest on the charged fraud. While Foudeh spoke with the agents on April 20, Mohammed Ali attempted to contact Foudeh several times on his pager.

With respect to the removal of the computer, Foudeh initially denied being at Alhumoz's office on the night of April 19. Subsequently, he admitted being at the site on that night but denied removing anything. Only when agents specifically asked if he had taken a laptop computer from the office did Foudeh acknowledge that he had done so, explaining that the computer was his, that he had loaned it to Alhumoz, that he did not know how his relative used the computer, and that the machine was then located in his apartment.

2. While evidence of motive is not essential to prove a defendant's criminal intent, it is a factor that may well illuminate that intent. See 1 L. Sand, Modern Federal Jury Instructions ¶ 6.06, at 6–18 (2002) (citing Judge Friendly's decision in United States v. Simon, 425 F.2d 796, 808 (2d Cir.1969)).

record indicates that both Alhumoz's wife and Mohammed Ali only learned of the fraud arrests on April 20.

Despite this evidence supporting the district court's conclusion that Alhumoz more likely than not directed the April 19 removal of the computer from his office, the majority points to a "number of equally plausible explanations for why Foudeh removed the laptop from the office" unrelated to any specific obstructive intent by Alhumoz. [*See ante* at 104.] I must respectfully disagree with the majority's characterization of these scenarios as "equally plausible," [3] although I certainly agree with its recognition of the well-established principle that "the task of choosing among competing, permissible infer-

ences is for the fact-finder, not for the reviewing court." [*See ante* at 104] (quoting *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir.2001)). To the extent the majority explains that it does not defer to the district court's choice in this case because no evidence of "words or conduct by the defendant" supports an inference of his specific intent to obstruct justice, [*see ante* at 104,] I reiterate the point I made at the outset, i.e., although there is no direct evidence of defendant's words or conduct on this point, considerable circumstantial evidence supports the district court's finding of obstructive conduct by Alhumoz, specifically, his direction to remove the computer from his office on the night of April 19.[4]

3. To the extent the majority suggests that Foudeh might simply have been retrieving a computer that did indeed belong to him, this hardly explains Foudeh's urgent need for the machine on the night of April 19 or makes it more likely than not that he would have removed it from Alhumoz's office without first speaking to Alhumoz.

Similarly unconvincing is the suggestion that Foudeh might have been acting in what he believed was Alhumoz's best interest, but not at his direction. This hypothesis presupposes that Foudeh learned of Alhumoz's arrest within hours of its occurrence on April 19 (a fact then unknown to Mrs. Alhumoz and Mohammed Ali); knew that the computer contained incriminating information (an assumption inconsistent with Foudeh's April 20 statement to the agents); knew that it was then in defendant's office (as opposed to Alhumoz's home, car, or any of the other places to which a laptop computer might easily be moved); and understood that to help Alhumoz, the computer's retrieval could not wait until the following morning (when agents planned to search the office). Nothing in the record, however, indicates that Foudeh could have learned these facts from a source other than Alhumoz himself.

The majority suggests that Foudeh might have been attempting to conceal his own peripheral role in the conspiracy, but this hypothesis is entirely speculative and unsupported by any record evidence.

Finally, the majority suggests that Mohammed Ali might have ordered the removal of the computer to conceal his participation in the fraud scheme. This possibility finds some support in the evidence of Mohammed Ali's efforts to page Foudeh on April 20. However, Foudeh told the agents only that his April 20 trip to Alhumoz's office was at Mohammed Ali's direction; at no time did he attribute his April 19 retrieval of the computer to Mohammed Ali. The district court had heard the trial testimony from Mustafa Yassin, indicating that Mohammed Ali did not learn of the fraud arrests until April 20. In any event, given the trust placed in Foudeh by Alhumoz's family on April 20, the district court reasonably concluded that it was "highly improbable" that Foudeh would have removed any property from Alhumoz's office at Mohammed Ali's request unless he were confident that Alhumoz himself had directed the actions. Sentencing Trans., May 30, 2002, at 30.

4. Common sense dictates that "words or conduct" by a defendant, like any other issue of fact, can be inferred from the totality of the circumstances. If evidence of a murder victim's hair and blood were found in the trunk of a person's car, that would be strong circumstantial evidence of homicidal conduct by the car owner. Indeed, murder convictions, which require proof beyond a reasonable doubt, have been upheld on such circumstan-

The majority's reference to "words or conduct by the defendant" appears to derive from *United States v. Hernandez*, 83 F.3d 582, 586 (2d Cir.1996) ("[t]here must be some acts or words on defendant's part to support an inference that she was involved in the [charged obstruction]"), a case that my colleagues analogize to this one. [*See ante* at 104.] I do not understand *Hernandez* to require a finding of clear error in this case.

Ms. Hernandez was a former DEA agent convicted after trial of embezzling agency funds. At sentencing, the prosecution sought an obstruction enhancement based upon a number of actions, including anonymous telephone threats left on the answering machines of two prosecution witnesses a few days after Ms. Hernandez was found guilty. This court ruled that defendant's recent conviction was not enough, by itself, to support an inference that she had instigated these calls. It observed: "There must be some acts or words on defendant's part to support an inference that she was involved in the phone call.", *Id.* at 586. The statement, made without citation to any authority, must be considered in light of the particular facts of the case. In *Hernandez*, the evidentiary problem was not a lack of words or acts by the defendant. Ms. Hernandez had directed a torrent of verbal abuse at one of the anonymous threat recipients, Mr. Thomas.[5] But once the court ruled that these abusive remarks did not indicate an obstructive intent,[6] there was no other evidence—direct or circumstantial—linking Ms. Hernandez to the anonymous calls. Specifically, unlike in this case, nothing in the circumstances of the calls suggested facts uniquely known to the defendant so as to make it more likely than not that she had arranged for the calls to be made.

The same evidentiary defect pertains to an allegedly obstructive meeting be-

---

tial evidence. *See, e.g., Commonwealth v. Marquetty*, 416 Mass. 445, 452–53, 622 N.E.2d 632, 638 (Mass.App.Ct.1993).

5. Specifically, the evidence indicated that after Ms. Hernandez learned that Mr. Thomas had testified against her in the grand jury, she "scream[ed] and holler[ed]" at him. 83 F.3d at 584. When Ms. Hernandez again encountered Thomas in the months between verdict and sentencing, she shouted at him, "die, die, die." *Id.*

6. Explaining that it was obliged to "read 'statements by the defendant ... in a light most favorable to the defendant,'" *id.* at 585 (quoting U.S.S.G. § 3C1.1, Application Note 1), the court characterized Ms. Hernandez's first encounter with Mr. Thomas as a simple display of fury: "Fury may be exceedingly unpleasant, but alone, it bespeaks no intent to obstruct justice." *Id.* at 586. As for the shouts of "die, die, die," the court observed: "It may very well be that Ms. Hernandez wished Thomas dead, and the sooner the better. But that is a very long way from showing that she made the statement in order to get

him to change his testimony at the sentencing hearing." *Id.*

Significantly, the court's analysis in *Hernandez* rested on an interpretation of Application Note 1 to U.S.S.G. § 3C1.1 that was particularly generous to the defendant. By its terms, that note did not require *all* allegedly obstructive words and actions by a defendant to be viewed in the light most favorable to her. Rather, it stated that "[i]n applying [§ 3C1.1] in respect to alleged *false testimony or statements* by the defendant, such testimony or statements should be evaluated in a light most favorable to the defendant." U.S.S.G. § 3C1.1, Application Note 1 (1995) (emphasis added); *see United States v. Cassiliano*, 137 F.3d at 747 (holding Application Note 1 applicable only to alleged false testimony or statements by the defendant). In any event, neither Application Note 1 nor *Hernandez*'s interpretation of it have any further bearing on this court's review of obstruction enhancements; the note was deleted from the Guidelines' commentary in 1997. *See United States v. Greer*, 285 F.3d 158, 183 (2d Cir.2002) (citing U.S.S.G. Manual App. C, amend. 566 (effective Nov. 1, 1997)).

tween Ms. Hernandez's uncle and a prosecution witness who thereafter recanted his testimony at trial. In that instance, no evidence indicated what had transpired between the uncle and the witness, precluding a finding that the encounter was obstructive, much less that defendant was responsible for it. *See id.* at 586 n. 3. Nevertheless, the court ruled that even if obstruction by the uncle were assumed, "nothing . . . indicates that the defendant even knew of, let alone was in any way responsible for, the uncle's alleged actions." *Id.* at 586. There simply was no evidence before the court—including no circumstantial evidence indicating that the timing of the meeting, the site where it occurred, or the information communicated involved facts known to Ms. Hernandez (but not likely to her uncle)—to support an inference that defendant had more likely than not instigated the encounter.

In sum, nothing in *Hernandez* suggests that a defendant cannot be linked to obstructive conduct by circumstantial evidence of words or actions. Because a preponderance of the circumstantial evidence in this case does indicate that Alhumoz more likely than not directed the April 19 removal of a computer from his office, the district court's finding of obstruction does not constitute clear error.

The majority notes that in other cases where we have upheld obstruction enhancements the evidence linking defendant to the challenged conduct has been stronger. [*See ante* at 104–105 & n. 4.] That may be so, but it hardly dictates a finding of clear error here. To satisfy the preponderance standard, evidence need only be sufficient to cause the evidentiary "scales [to] tip, however slightly," in favor of a finding that Alhumoz directed the removal of a computer from his office on the night of April 19, 2000, specifically intending thereby to obstruct justice. *See* 4 L. Sand, *Modern Federal Jury Instructions* ¶ 73.01, at 73–2 (1994).[7] The evidence in this case clearly established defendant's motive to remove the computer on April 19, as well as his access to the means and opportunity to carry out such obstruction. The evidence further indicated that Alhumoz had a unique appreciation for the need to remove the computer during the night of April 19 and not to wait until the next morning. Finally, the evidence indicated that the removal was effected by a person close to and trusted by Alhumoz. Under these circumstances, I cannot conclude that the district court clearly erred in finding that Alhumoz more likely than not directed the removal of the computer from his office with the specific intent to obstruct justice. Accordingly, I would affirm

7. The majority also suggests that in some cases where we have reversed obstruction enhancements, the evidence of specific intent was stronger. That was certainly true in *United States v. Hernandez,* 83 F.3d at 584–87, but as already noted in footnote 6 to this opinion, this court's review of critical conduct in that case was informed by a liberal application of guideline commentary that is no longer in effect. As for *United States v. Williams,* 79 F.3d 334, 336–37 (2d Cir.1996), our reversal was based on another guideline commentary inapplicable to this case. *See* U.S.S.G. § 3C1.1, Application Note 3(g) (providing for materially false statement to law enforcement officer to qualify as obstruction only when it significantly obstructs or impedes the investigation or prosecution). Finally, in *United States v. Perdomo,* 927 F.2d 111 (2d Cir.1991), we did not reverse a district court's finding of obstruction because defendant's actions were susceptible to an innocent reading; rather, we remanded because the district court had not made a specific finding as to whether defendant "in fact intended to obstruct justice," *id.* at 118 ("[s]uch a finding of a specific intent to obstruct justice is a prerequisite to the two level enhancement"). In this case, the district court made the required finding of specific intent.

its application of the obstruction enhancement in this case.