**19-4362-cr**
*United States v. Capelli*

# In the
# United States Court of Appeals
## For the Second Circuit

————

AUGUST TERM 2021

ARGUED: SEPTEMBER 1, 2021
DECIDED: JUNE 21, 2022

No. 19-4362-cr

UNITED STATES OF AMERICA,
*Appellee*,

*v.*

SCOTT BODNAR, AKA PEP, TERRELL GIVENS, DONALD BURNS,
*Defendants*,

ROBERT CAPELLI,
*Defendant-Appellant*.

————

Appeal from the United States District Court
for the District of Connecticut.

————

Before: WALKER, CALABRESI, and MENASHI, *Circuit Judges*.

————

Robert Capelli was convicted of possessing marijuana with intent to distribute, and of conspiracy to distribute and possess with

intent to distribute, 100 kilograms or more of marijuana following a jury trial in the United States District Court for the District of Connecticut. On appeal, he claims that (1) the district court (Janet Bond Arterton, *J.*) erred in denying his motion to suppress marijuana that was obtained during a warrantless search of a private single-engine airplane; (2) the government improperly bolstered the testimony of its cooperating witnesses at trial; and (3) he received ineffective assistance of counsel at sentencing. We hold that the vehicle exception to the Fourth Amendment's warrant requirement applies to the search of the private aircraft used to transport Capelli's marijuana and that there was probable cause to search the plane. There is no merit to Capelli's remaining challenges. Accordingly, we **AFFIRM** the denial of the motion to suppress, the judgment of conviction, and the sentence.

————

> RAHUL KALE (Marc H. Silverman, *on the brief*), Assistant United States Attorneys, *for* Leonard C. Boyle, Acting United States Attorney for the District of Connecticut, New Haven, CT, *for Appellee the United States of America.*
>
> TINA SCHNEIDER, Portland, ME, *for Defendant-Appellant Robert Capelli.*

————

JOHN M. WALKER, JR., *Circuit Judge*:

Robert Capelli was convicted of possessing marijuana with intent to distribute, and of conspiracy to distribute and possess with intent to distribute, 100 kilograms or more of marijuana following a jury trial in the United States District Court for the District of Connecticut. On appeal, he claims that (1) the district court (Janet Bond Arterton, *J.*) erred in denying his motion to suppress marijuana that was obtained during a warrantless search of a private single-engine airplane; (2) the government improperly bolstered the testimony of its cooperating witnesses at trial; and (3) he received ineffective assistance of counsel at sentencing. We hold that the vehicle exception to the Fourth Amendment's warrant requirement applies to the search of the private aircraft used to transport Capelli's marijuana and that there was probable cause to search the plane. There is no merit to Capelli's remaining challenges. Accordingly, we **AFFIRM** the denial of the motion to suppress, the judgment of conviction, and the sentence.

## BACKGROUND

The following background is taken from the undisputed facts in Capelli's motion to suppress, as well as from the evidence introduced at trial.

### The Charged Conduct

Beginning in 2013, Capelli, together with co-defendants Scott Bodnar and Terrell Givens, transported bulk quantities of marijuana from California to Connecticut. At first, the three flew on commercial flights to California, purchased marijuana there, and mailed the drugs

in packages back to Connecticut for distribution. They began by mailing five-pound packages and later increased the weight of the shipments ten-fold.

As their operation grew, their transportation scheme evolved. They enlisted a pilot, Donald Burns, to fly a Piper single-engine propeller airplane between the coasts and carry purchase money on the outbound flight to California and marijuana on the return. The marijuana was packaged in vacuum-sealed bags stored in black duffle bags. Capelli coordinated the flights with Burns and managed the finances of the operation. He tracked the marijuana shipments and enterprise profits on detailed spreadsheets saved on a thumb drive.

With Burns transporting the cash and marijuana on the plane, Capelli, Bodnar, and Givens continued to make round trips to California on commercial flights to purchase the marijuana. When Burns returned to Connecticut with a marijuana shipment, he would deliver it to Capelli and his two associates at a pre-arranged location where they would prepare the marijuana for distribution.

In 2016, Steven Hobart joined the scheme. Hobart knew marijuana suppliers and arranged for lodging for Capelli and the others when they visited California. Hobart also paid Capelli to transport Hobart's own cash and marijuana on Burns's plane.

The June 29, 2017 Search

The frequency and timing of Burns's flights and his unusual flight path caught the attention of the Federal Aviation Administration ("FAA"). Two single-engine Piper 32 aircrafts registered to Burns made at least 15 round trips to the same area in Northern California between 2015 and 2017. Instead of flying

directly, Burns flew along the southern border of the United States, adding hundreds of miles and significant costs to each trip. Burns routinely returned to Connecticut shortly after arriving in California. Moreover, flying cross-country in a single-engine plane costs considerably more than commercial air-travel. After determining that Burns was living in Connecticut, where both aircrafts were registered, the FAA alerted the Drug Enforcement Administration ("DEA") that it was monitoring Burns's travel.

On June 29, 2017, after tracking one of Burns's cross-country flights, DEA agents and local police met Burns at the airport in Stratford, Connecticut as he was climbing out of the plane. Agent Carlos Penagos confirmed Burns's identity, identified himself as a member of the DEA, and explained that he "was there to conduct a ramp check."[1] During a ramp check, a pilot must produce his credentials and other documents for inspection. The FAA has delegated the authority to conduct ramp checks to "[f]ederal, [s]tate, [and] local law enforcement."[2] A ramp check ensures compliance with FAA regulations and does not require even suspicion of an antecedent violation for law enforcement to conduct one.[3]

Burns asked Agent Penagos whether he needed a warrant to conduct the ramp check. The agent responded, correctly, that he did not. During this encounter, Agent Penagos observed that Burns was "evading," "expressing nervousness," and unable to sustain eye contact.[4]

---

[1] Government App'x 47.

[2] 14 C.F.R. §§ 61.3(*l*)(3), 61.51(i)(1)(iii).

[3] *Id.*

[4] Government App'x 47.

Additionally, according to the DEA report of investigation, when Agent Penagos asked Burns whether there were firearms or anything illegal on board, Burns answered that there might be "some marijuana."[5]   The report further detailed that Agent Penagos then informed Burns of his *Miranda*[6] rights, Burns confirmed that he understood those rights, and Agent Penagos requested consent to search the plane.   According to the report, Burns both verbally consented and signed a DEA Consent to Search form.

At some point after Agent Penagos's conversation with Burns had begun, a drug sniffing canine and handler from the Stratford Police Department approached the plane.  During an exterior sweep of the plane, the dog alerted to the presence of narcotics.  Significantly, the DEA agents and police officers did not search the airplane until after both the canine alert and Burns's signed consent.

As a result of the search, the agents and officers found 16 duffle bags containing approximately 400 pounds of marijuana in the interior of the plane.  Burns told the agents that the drugs were to be delivered to Capelli.  With Burns's cooperation, the agents arranged for a controlled delivery.  At the agreed-upon location, the agents encountered Capelli, Bodnar, and a third person, Alex Maldonado. They arrested Capelli and Bodnar and recovered two cell phones and the thumb drive.  Maldonado was not arrested.

The DEA later obtained a warrant to search Capelli's cell phones and the thumb drive.  One phone contained records relating to the cross-country travel, including Capelli's communications with Burns.   The search of the thumb drive revealed the spreadsheets

---

[5] Capelli App'x 78.
[6] *Miranda v. Arizona*, 384 U.S. 436 (1966).

detailing the finances of the operation, including the quantities, prices, and kinds of marijuana purchased, the distribution of the drugs among the members of the scheme, the expenses incurred on each trip, and the scheme's profits.

A grand jury returned a four-count superseding indictment charging Capelli with conspiracy to distribute and to possess with intent to distribute 1,000 kilograms or more of marijuana (Count 1), possession with intent to distribute 100 kilograms or more of marijuana (Count 2), conspiracy to commit money laundering (Count 3), and money laundering (Count 4). Before trial, Cappelli unsuccessfully moved to suppress the marijuana recovered from the plane.

Conviction, Sentence, and Appeal

Capelli went to trial on all counts. The government's evidence included the seized marijuana; the spreadsheets from the thumb drive; text messages between Capelli and Burns; videos from Capelli's cell phones, in which he flaunted his wealth and discussed his trips to California; travel records for Capelli and his co-defendants; testimony from government agents, including Agent Penagos and an FAA agent; and testimony from Maldonado and Hobart, who had cooperation agreements with the government.

The jury convicted Capelli of a lesser-included offense within Count One, finding him guilty of conspiracy to distribute and possess with intent to distribute 100 kilograms or more of marijuana. The jury also found Capelli guilty of possession with intent to distribute the same amount, as charged in Count Two. The jury acquitted Capelli

of money laundering and its related conspiracy, as charged in Counts Three and Four.

The district court sentenced Capelli to prison for 95 months on Counts One and Two (to run concurrently), followed by the mandatory minimum of four years of supervised release; imposed a fine of $30,000; and levied a $200 special assessment. Capelli timely appealed.

## DISCUSSION

On appeal, Capelli challenges the denial of his motion to suppress; argues that, at trial, the government impermissibly bolstered the testimony of its cooperating witnesses; and claims that his counsel was ineffective for failing to request an offense level reduction at sentencing. None of these claims, which we discuss in order, has merit.

## I. Suppression Under the Fourth Amendment Was Properly Denied

Before trial, Capelli moved to suppress the marijuana recovered from the plane. To support his motion to suppress, Capelli argued that the agents' reason for conducting the ramp check was pretextual and that they had exceeded regulatory bounds in conducting it. Capelli also challenged the government's claim that Burns had validly consented to a search of the plane, arguing that any such agreement was the result of intimidation and thus invalid. Capelli did not dispute the drug sniffing dog's alert to the exterior of the plane.

The district court, upon oral argument but without an evidentiary hearing, denied the motion to suppress on the basis that Capelli lacked a reasonable expectation of privacy in the duffle bags. Accordingly, it did not reach the issue of whether the agents had probable cause to conduct the search, or whether Burns's consent was valid.

In reviewing the district court's determination, we are mindful that "the ultimate touchstone of the Fourth Amendment is 'reasonableness'"[7] and, generally, warrantless searches are per se unreasonable.[8]   However, there are a number of "specifically established and well delineated exceptions" to the general rule.[9]  The one at issue here is the so-called "vehicle exception," under which law enforcement may search a vehicle without a warrant if they have probable cause to "believe the vehicle contains contraband or other evidence of a crime."[10]

We review a district court's ruling on a suppression motion for clear error as to factual findings and *de novo* as to legal issues, including probable cause and the applicability of the vehicle exception.[11]  Because the agents had probable cause to search the plane and because we hold that the "vehicle exception" applies to the

---

[7] *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).

[8] *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971).

[9] *Id.* at 455 (internal citations omitted).

[10] *United States v. Howard*, 489 F.3d 484, 492 (2d Cir. 2007) (internal citations omitted).

[11] *United States v. Lyle*, 919 F.3d 716, 727 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 846 (2020); *see also Howard*, 489 F.3d at 490-91.

private aircraft that Burns piloted, the government's seizure of the marijuana did not violate the Fourth Amendment.[12]

## A. The Agents Had Probable Cause to Search the Plane

Unlike a traffic stop, law enforcement agents may conduct a ramp check absent an antecedent violation or even reasonable suspicion of one.[13]  The ramp check by itself was therefore a proper exercise of regulatory authority.  But some time after Agent Penagos requested Burns's credentials, the ramp check evolved into an investigatory stop as part of a broader investigation into whether Burns was transporting contraband.  Thus, we must determine whether that investigatory stop was proper.

Law enforcement may briefly detain a person pursuant to an "investigatory stop" as long as an officer has reasonable suspicion that the person stopped "*may*"[14] be engaged in criminal activity.[15] Reasonable suspicion requires more than an inarticulable "hunch" but demands less than probable cause.[16]  We consider whether this standard has been satisfied "through the eyes of a reasonable and cautious officer on the scene, whose insights are necessarily guided

---

[12] Because we consider the reasonableness of the search, we assume without deciding that Capelli had a reasonable expectation of privacy in the duffle bags, and so do not review the district court's analysis on this point.  *See Cromwell Assocs. v. Oliver Cromwell Owners, Inc.*, 941 F.2d 107, 111 (2d Cir. 1991) ("We may, of course, affirm on any basis for which there is a record sufficient to permit conclusions of law, including grounds upon which the district court did not rely.").  We likewise do not review the issue of whether the search was independently permissible due to Burns's consent.

[13] 14 C.F.R. §§ 61.3(*l*)(3), 61.51(i)(1)(iii).

[14] *United States v. Santillan*, 902 F.3d 49, 56 (2d Cir. 2018) (internal quotation omitted).

[15] *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968).

[16] *United States v. Compton*, 830 F.3d 55, 61 (2d Cir. 2016).

by the officer's experience and training."[17]   The question here is whether there was reasonable suspicion to continue the investigatory stop following the ramp check.  There was.

The details of Burns's cross-country travels, uncovered by the FAA, coupled with his demeanor at the time of the ramp check, convince us that the DEA agents had reasonable suspicion to stop Burns on the tarmac to investigate further for drug trafficking activity. There is nothing suspicious about frequent travel between Connecticut and California on its own.  But FAA personnel found Burns's conduct sufficiently suspect to merit a referral to the DEA.[18] The FAA flagged Burns's "unusual" flight pattern for a single-engine propeller airplane.  Burns made at least 15 cross-country roundtrips between 2015 and 2017 and did so indirectly by flying along the southern border.  Proximity to the national border may support reasonable suspicion given that our borders "uniquely implicate various criminal activities—including contraband smuggling."[19] Burns's indirect flight path nearly doubled his transit time, required additional refueling stops, and increased the costs of the trip, without the amenities available on a commercial jet.[20]  This raised a "red flag."[21]  The "quick turnaround"[22] that Burns made after arriving in

---

[17] *United States v. Weaver*, 9 F.4th 129, 140 (2d Cir. 2021) (en banc) (internal quotation omitted).

[18] The FAA refers suspicious activity to the appropriate law enforcement agency to engage in further investigation if warranted.

[19] *Compton*, 830 F.3d at 63

[20] Government App'x 17-18.

[21] Government App'x 19.

[22] Government App'x 23.

California, given his extensive travel time, did too.[23]  Capelli does not contest these facts.

The agents' suspicions were further heightened when Agent Penagos observed Burns to be evasive, nervous, and avoiding eye contact during the ramp check.  We have recognized "[n]ervousness, particularly extreme nervousness, [to be] a factor supporting reasonable suspicion."[24]  The DEA agents thus had articulable facts to conclude that Burns might be engaged in criminal activity, which was a sufficient basis for them to investigate further, including by deploying the drug sniffing dog.

Capelli challenges the ramp check as a pretext for the dog sniff.  He may be right, but that is not impermissible.  "[A] pretextual stop and reasonable suspicion are not mutually exclusive . . . ."[25]  The government admits that the agents sought to determine not only whether the plane and pilot were fit to fly, but also whether Burns was involved in drug trafficking.  Law enforcement was duly authorized to conduct the ramp check, which Capelli concedes, and could permissibly prolong the stop because they developed reasonable suspicion "based on the actions of a driver or passenger either (i) before the stop, or (ii) during traffic-related processing of the stop."[26]  The subsequent dog sniff was a reasonable and unintrusive means of detecting whether there was contraband on the aircraft.

The undisputed facts establish that the ramp check was not impermissibly prolonged to conduct the dog sniff.  No bright-line

---

[23] *See United States v. Sokolow*, 490 U.S. 1, 9 (1989).

[24] *Santillan*, 902 F.3d at 57.

[25] *United States v. Gomez*, 877 F.3d 76, 93 n. 27 (2d Cir. 2017).

[26] *Id.*

time limit exists in the case law for determining how long officers acting on reasonable suspicion can delay a search to wait for a dog sniff before the search becomes unreasonable.[27]  But to the extent that there was any such delay here, under the circumstances of this case, it fell far short of impermissible.[28]

With the canine alert, the agents' reasonable suspicion ripened into sufficient probable cause to support the search.[29]  Probable cause exists when the "totality of circumstances indicates a fair probability that contraband or evidence of a crime will be found in a particular place."[30]  Capelli has not challenged the reliability of the dog alert at any time.  Nor does Capelli question that an alert can provide probable cause to search for the presence of a controlled substance.  Instead, Capelli's argument is that, after the agents had what they believed to be probable cause, they were required to obtain a search warrant before entering and searching the aircraft.

## B.  The "Vehicle Exception" Applies to Private Aircrafts

With probable cause established, we now turn to whether the "vehicle exception" to the usual warrant requirement justified the agents warrantless search of the plane.  We have not previously addressed whether this "vehicle exception" can be applied to

---

[27] *United States v. Place*, 462 U.S. 696, 709-10 (1983).

[28] Capelli's trial counsel, for example, characterized the delay as "[s]imultaneous to the DEA agents addressing Mr. Burns."  Capelli App'x 49.

[29] *Florida v. Harris*, 568 U.S. 237, 247 (2013) ("[A] court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search.); *United States v. McKenzie*, 13 F.4th 223, 236 (2d Cir. 2021) (same); *accord United States v. Glover*, 957 F.2d 1004, 1013 (2d Cir. 1992) ("[O]nce the narcotics dog 'hit on' Glover's bags, the police had probable cause to obtain a search warrant.").

[30] *United States v. Clark*, 638 F.3d 89, 94 (2d Cir. 2011) (internal citation and quotation marks omitted); *see Illinois v. Gates*, 462 U.S. 213, 238 (1983).

privately owned and operated airplanes, like the one Burns piloted.[31] We hold today that it can. The two distinct lines of reasoning that explain the exception, vehicle mobility and a reduced expectation of privacy, apply to privately owned and operated aircraft.

The prohibition-era case that first recognized the exception, *Carroll v. United States*,[32] did so because of the impracticability of securing a warrant for a vehicle that "can be quickly moved out of the locality or jurisdiction in which the warrant must be sought."[33] The Court distinguished between a search of a "store, dwelling house, or other structure" and that of a "ship, motor boat, wagon, or automobile."[34] Goods concealed in the latter category could "readily" be "put out of reach of a search warrant."[35] Thus, the readily mobile character of vehicles sufficiently justifies a warrantless search.[36]

---

[31] The Sixth, Ninth, Tenth, and Eleventh Circuit Courts of Appeals have applied the exception to airplanes. *See, e.g.*, *United States v. Nigro*, 727 F.2d 100, 104-07 (6th Cir. 1984); *United States v. Flickinger*, 573 F.2d 1349, 1357 (9th Cir. 1978), *overruled on other grounds*, *United States v. McConney*, 728 F.2d 1195 (9th Cir. 1984); *United States v. Finefrock*, 668 F.2d 1168, 1171-72 (10th Cir. 1982); *United States v. Gooch*, 603 F.2d 122, 124-25 (10th Cir. 1979); *United States v. Sigal*, 500 F.2d 1118, 1121-23 (10th Cir. 1974); *United States v. Rollins*, 699 F.2d 530, 534 (11th Cir. 1983). *Cf. United States v. Brennan*, 538 F.2d 711, 721 (5th Cir. 1976) (finding an airplane's mobility created exigent circumstances that justified a warrantless search "[w]ithout holding that an airplane is the legal equivalent of an automobile").

The Supreme Court has not squarely addressed the issue but, citing *Rollins*, remarked that courts "have not hesitated to apply the vehicle exception to vehicles other than automobiles." *California v. Carney*, 471 U.S. 386, 393 n.2 (1985).

[32] 267 U.S. 132, 153 (1925).

[33] *Id.* at 153.

[34] *Id.*

[35] *Id.* at 151.

[36] *See Maryland v. Dyson*, 527 U.S. 465, 466-67 (1999) (confirming that the exception has no separate exigency requirement).

Since *Carroll*, we have conceptualized the "readily mobile" rationale to focus on whether a vehicle is inherently mobile.[37] Inherent mobility does not mean "immediate mobility,"[38] and a vehicle need not literally be in motion for it to be "obviously readily mobile."[39] For that reason, "[t]he justification to conduct . . . a warrantless search does not vanish once the car has been immobilized."[40] In *United States v. Navas*, we held that the exception applied to the search of a stationary tractor-trailer that was unhitched, separated from both its cab and its driver, and parked in a warehouse.[41] Because the tractor-trailer *could* be hitched and was capable of being driven away, it was considered movable. We also explained that the location of the operator of a vehicle in relation to the vehicle at the time of a search is not relevant to whether the vehicle is, for purposes of the exception, inherently mobile.[42]

The inherent-mobility rationale, while a "principal" reason for the vehicle exception, is not its sole justification.[43] The more recent *California v. Carney* finds the exception supported by a person's reduced expectation of privacy in a vehicle given the "pervasive and continuing governmental regulation and control[]" of vehicles,

---

[37] *Howard*, 489 F.3d at 493 (discussing *Chambers v. Maroney*, 399 U.S. 42, 50-51 (1970)).

[38] *Id.* at 492.

[39] *California v. Carney*, 471 U.S. 386, 393 (1985).

[40] *Michigan v. Thomas*, 458 U.S. 259, 261 (1982).

[41] 597 F.3d 492, 496-97 (2d Cir. 2010).

[42] *Id.* at 500.

[43] *Carney*, 471 U.S. at 390-91.

including "periodic inspection and licensing requirements" that find no analogue with a person's home or office.[44]

Nothing in the *Carroll* and *Carney* lines of cases suggest that the inherent mobility or reduced privacy expectation rationales are confined to automobiles. Indeed, *Carroll* itself suggested otherwise when it referred to "ship[s]" and "motor boats."[45]

The mobility of an airplane in flight is so obvious that it needs no elaboration. And even when a plane is on the ground, it is no less capable of being moved than, say, a non-residential unhitched tractor-trailer. The fact that the search here occurred while the plane was sitting on the tarmac and the pilot was not in the pilot's seat does not alter the calculus.

The reduced expectation of privacy rationale is similarly applicable. Airplanes and their operators are subject to far more onerous and complex regulatory requirements than automobiles. Title 14 of the Code of Federal Regulations sets out regulatory standards for all aspects of aviation, including airworthiness, piloting credentials and licensing, maintenance, and safety.[46] That law enforcement can conduct a ramp check for any reason exemplifies this highly regulated regime.

Nor is a small private plane the sort of "hybrid" vehicle that presents a closer case when the mobility and privacy rationales are in tension.[47] Unlike a mobile home or houseboat, which courts have still

---

[44] *Id.* at 392 (quoting *South Dakota v. Opperman*, 428 U.S. 364, 368 (1976)); *see also Cady v. Dombrowski*, 413 U.S. 433, 440-41 (1973).

[45] *Carroll*, 267 U.S. at 153.

[46] *See generally* 14 C.F.R. §§ 21-193.

[47] *Carney*, 471 U.S. at 395 (Stevens, J., dissenting).

found to be subject to the exception,[48] this sort of aircraft does not bear indicia of being both a vehicle *and* a residence.[49]

Capelli offers no persuasive argument against applying the exception. That fewer people may be licensed to operate a plane, as opposed to a car, does not place into question a plane's inherent mobility. And his claim that a plane's passengers and cargo are not in plain view is similarly irrelevant to whether the exception applies. As the Supreme Court has made clear, "these reduced expectations of privacy derive not from the fact that the area to be searched is in plain view, but from the pervasive regulation of vehicles capable of traveling on the public highways."[50]

Because the agents had probable cause to conduct a warrantless search pursuant to the vehicle exception, we affirm the district court's denial of the motion to suppress. We thus reject Capelli's claim that an evidentiary hearing was necessary to resolve certain disputed facts as to the ownership of the plane (or as to whether Burns's consent was validly obtained). The particular facts that support our determination are uncontroverted.

---

[48] *See, e.g., id.* at 393-94 (majority opinion) (applying the exception to a motor home, notwithstanding its use as a residence, because the "motor home was readily mobile," operated on public streets, and was subject to inspection and regulation); *United States v. Hill*, 855 F.2d 664, 667-68 (10th Cir. 1988) (applying the exception to a houseboat given its ready mobility and objective indications that it was being used for transportation); *United States v. Albers*, 136 F.3d 670, 672-73 (9th Cir. 1998), *as amended on denial of reh'g* (Mar. 20, 1998) (same).

[49] The Piper airplane Burns piloted does not even have a lavatory onboard. Government App'x 18 (testimony of FAA official).

[50] *Carney*, 471 U.S. at 392.

## II.    Capelli Waived His Challenge to the Admission of the Truth-Telling Content of the Cooperation Agreements

Capelli also argues that the government engaged in improper witness bolstering when, as part of its direct case, it elicited testimony from cooperating witnesses about the truth-telling provisions of their cooperation agreements.  But at trial Capelli agreed to the admission into evidence of the cooperation agreements and did not object to the prosecutor's questions he now challenges, or otherwise preserve his present objections.  The government responds that Capelli has waived his challenge on appeal.  We agree.

Federal Rule of Criminal Procedure 52(b) gives courts "discretion to correct errors that were forfeited" by mistake or oversight.[51]  Evidentiary challenges of this nature are reviewed for plain error.[52]  But "no such discretion applies when there has been true waiver," which is when a party has intentionally relinquished or abandoned a known right.[53]  When "a party raises no objection to a purported error" for tactical reasons, such inaction "constitutes a true waiver."[54]  Because waiver "negate[s] even plain error review,"[55] we must ensure that the record supports the "critical determination" that

---

[51] *United States v. Williams*, 930 F.3d 44, 64 (2d Cir. 2019), *cert. denied sub nom. Williams v. United States*, 141 S. Ct. 2816 (2021) (internal quotation marks and emphasis omitted).

[52] *See, e.g., United States v. Certified Env't Servs., Inc.*, 753 F.3d 72, 96 (2d Cir. 2014) (internal emphasis omitted).

[53] *United States v. Spruill*, 808 F.3d 585, 596-97 (2d Cir. 2015).

[54] *United States v. Quinones*, 511 F.3d 289, 321 (2d Cir. 2007) (internal quotation marks omitted).

[55] *Id.* (internal quotation omitted).

the defendant "acted intentionally in pursuing, or not pursuing, a particular course of action."[56]

On direct examination, the government may ask its witness about the existence of a cooperation agreement to "preclude any inference of concealment by the government."[57] Generally, however, the government may not introduce the agreement into evidence until the defense has challenged the witness's credibility on cross examination, lest the government run afoul of Federal Rule of Evidence 608(a)'s prohibition on impermissible bolstering.[58] Here the agreements were received into evidence during the government's direct examination, but under the circumstances it was permissible. The record shows that Capelli, through his counsel, affirmatively agreed to their introduction and, in so doing, intentionally waived this claim. Prior to the admission of the agreements, defense counsel and the government discussed, off the record, the matter of admitting them. Thus, when the government moved to introduce the first cooperation agreement during direct examination, the two lawyers had the following exchange:

> GOV'T: *I had spoken to counsel about this.* We can move in Government's Exhibit 35 [the cooperation agreement]. Is that okay?
>
> DEFENSE: Can we have a second? *Oh, yeah. No objection.*[59]

In response to the government's request to admit the second cooperation agreement when its second witness testified on direct

---

[56] *Spruill*, 808 F.3d at 597.

[57] *United States v. Fernandez*, 829 F.2d 363, 365 (2d Cir. 1987) (per curiam).

[58] *United States v. Borello*, 766 F.2d 46, 56 (2d Cir. 1985).

[59] Government App'x 101 (emphasis added).

and to the prosecutor's statement that "I don't think there's any objection," defense counsel again confirmed, "No objection."[60]

This case thus differs from those appeals in which a defendant, perhaps through inadvertence, fails to challenge the government's offer of the agreements or related testimony on direct examination. Here, the parties' prior discussions to admit the cooperation agreements together with defense counsel's affirmative agreement at trial plainly demonstrate that Capelli's counsel made a considered decision *not* to object. While we do not require an "identifiable tactical benefit" to find waiver, we readily observe such a benefit here and it is probative of defendant's intentional relinquishment of a right.[61] Defense counsel's decision not to object to the government's subsequent questions posed to the witnesses about their cooperating status offered a significant tactical benefit. On cross examination, defense counsel used the cooperation agreements to probe any biases that the government's witnesses might harbor, including that their testimony was given in exchange for the possibility of leniency at sentencing. Defense counsel stressed those possible biases in his summation. Capelli's lack of objection was thus not a forfeiture subject to plain error review, but a strategic choice that forecloses our review.

### III.    Capelli Did Not Receive Ineffective Assistance of Counsel

Finally, Capelli contends that his trial counsel provided ineffective representation when counsel failed to seek a sentencing reduction for acceptance of responsibility. Our general approach is to

---

[60] Government App'x 142.

[61] *Spruill*, 808 F.3d at 599.

decline to review ineffective assistance claims on direct review without prejudice to a defendant later raising them collaterally under 28 U.S.C. § 2255.[62] This permits district courts to develop a factual record and to hear from the allegedly ineffective attorney.[63] But we may decide these claims on direct appeal when "the factual record is fully developed and resolution of the Sixth Amendment claim on direct appeal is 'beyond any doubt' or 'in the interest of justice.'"[64] That is the case here.

To prevail on an ineffective assistance of counsel claim, "the defendant must show that counsel's performance was deficient" and that this "deficient performance prejudiced the defense."[65] The defendant bears a heavy burden.[66] Counsel's performance is deficient only when a defendant can show errors that are so serious that his attorney effectively did not function as constitutionally guaranteed "counsel."[67] To establish prejudice, the defendant must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[68] If the reviewing court finds that the defendant did not suffer prejudice, it need not address whether counsel's performance was deficient.[69]

---

[62] *See Massaro v. United States*, 538 U.S. 500, 504-05 (2003).

[63] *United States v. Khedr*, 343 F.3d 96, 100 (2d Cir. 2003).

[64] *United States v. Gaskin*, 364 F.3d 438, 468 (2d Cir. 2004) (citing *Khedr*, 343 F.3d at 100).

[65] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

[66] *Gaskin*, 364 F.3d at 468.

[67] *Strickland*, 466 U.S. at 687.

[68] *Id.* at 694.

[69] *Id.* at 697.

Capelli faults his counsel for not arguing that the district court should reduce his total offense level under the Sentencing Guidelines to reflect an acceptance of responsibility. Capelli claims that, despite proceeding to trial on all counts, he accepted responsibility for possessing 100 kilograms of marijuana, for which he should have received credit at sentencing. He points to his counsel's opening statement and closing argument at trial in support of this claim. Both times, defense counsel told the jury that they would find "sufficient evidence to convict Bobby Capelli of Count Two."[70]

Section 3E1.1 of the Federal Sentencing Guidelines provides that the sentencing court may adjust a defendant's offense level downward by two levels when a defendant "clearly demonstrates acceptance of responsibility for his offense."[71] An additional one level reduction is available for a defendant who both accepts responsibility and also assists the government in the investigation or prosecution of his own misconduct.[72] In Capelli' s case, a total offense level of 35 and Criminal History Category of I resulted in a Guidelines range of 168-210 months. A two-level downward adjustment of the offense level would have yielded a range of 135-168 months. Capelli was sentenced to 95 months.

Application Note 2 to Section 3E1.1 clarifies, however, that the adjustment is "not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and

---

[70] Capelli App'x 167, 180.
[71] U.S.S.G. § 3E1.1(a).
[72] U.S.S.G. § 3E1.1 cmt. n.6.

expresses remorse."[73]   A defendant who proceeds to trial and is convicted is not per se ineligible for this sentencing reduction.  But that would be the "rare" situation, such as when a defendant challenges a statute's applicability to his conduct or its constitutionality and thus preserves issues that are unrelated to factual guilt.  In those cases, a defendant's "pre-trial statements and conduct" inform whether he has accepted responsibility.[74]

Among the considerations relevant to determining whether a defendant is entitled to a two-level reduction is whether the defendant "truthfully admit[s] the conduct comprising the offense(s) of conviction."[75]   Capelli, who went to trial on all counts in the indictment, admitted to only some of the conduct for which he was convicted.  Despite counsel's acknowledgment of the strength of the government's evidence on the substantive drug trafficking offense (Count Two), the government was still required to offer evidence on that count and to fully prove the related drug conspiracy count (Count One).[76]   Capelli's conviction for a lesser-included offense on Count One based on the finding that the conspiracy did not involve more than 1,000 kilograms does not change our analysis.  The government was still required to prove Capelli was involved in a drug trafficking conspiracy.

Moreover, based on Capelli's admissions, his is not one of the "rare" cases in which a defendant has clearly demonstrated full acceptance of responsibility despite proceeding to trial.  Capelli

---

[73] U.S.S.G. § 3E1.1 cmt. n.2.

[74] *Id.*

[75] U.S.S.G. § 3E1.1 cmt. n.1(A).

[76] Government App'x 10.

concedes that his reason for proceeding to trial does not fall within the exceptions outlined in Application Note 2: in his reply brief he states that he "went to trial to contest factual issues," namely the amount of marijuana that was seized for purposes of Counts One and Two.[77] Notwithstanding counsel's admissions to the jury, "[n]othing in the record indicates that [Capelli] had any purpose in going to trial other than to deny his factual guilt."[78]

The record is also devoid of anything suggesting that Capelli had demonstrated acceptance of responsibility *pre-trial*. He concedes that his counsel's opening statement at trial is the first instance in which he admitted the strength of the government's evidence on Count Two. He claims that his failure to accept responsibility pre-trial affects only his eligibility for the additional one-level reduction for assisting the government's investigation.[79] Not so. Timeliness is also a relevant consideration in determining whether the defendant qualifies for the two-level reduction.[80]

Based on Capelli's pre-trial conduct and his concessions to this court, we decline to find that that he "clearly" accepted responsibility in this case. Because Capelli was not entitled to an acceptance of responsibility reduction in his offense level, he was not prejudiced by his counsel's failure to request one.

---

[77] Capelli Reply Br. at 10.

[78] *United States v. Castano*, 999 F.2d 615, 617 (2d Cir. 1993) (per curiam).

[79] Capelli Reply Br. at 10; U.S.S.G. § 3E1.1 cmt. n.6.

[80] U.S.S.G. § 3E1.1 cmt. n.1(H).

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of conviction and sentence in all respects.